CASE 48—ACTION ON A POLICY OF LIFE INSURANCE—JAN. 9.

# Manhattan Life Ins. Co. v. Beard.

APPEAL FROM M'CRACKEN CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS.    REVERSED.

112    455
114    511
115    546

112    455
121    354

112    455
f128    391
f129    708

LIFE INSURANCE—PROVISION AGAINST SUICIDE WHILE SANE OR INSANE.

Held:   1. Under a policy providing that it shall be void if the in-
sured "die by his own act, sane or insane," there can be no
recovery if insured took his life when he had mind enough
to know that the act by which he did so would probably re-
sult in his death, and he committed it with the intention that
it should do so, though he may not from mental derange-
ment have known that his act was wrong, and may not have
had the will power to resist the insane impulse, and it was
therefore error to instruct the jury that before they could
find for defendant they must believe that insured "possessed
sufficient will power at the time to refrain from taking his
own life."

2. Under Civ. Code Prac. section 606, sub-sec. 1, providing that
"neither a husband nor a wife shall testify, even after the
cessation of their marriage, concerning any communication be-
tween them during marriage," the widow of insured was not
competent to testify as to conversations between her and her
deceased husband, or as to the contents of letters from one to
the other, nor was she competent under Id. sub-sec. 2, to
testify in her own behalf as beneficiary under the policy as
to acts done by, or transactions with, decedent.

3. A medical expert, who had not seen the dead body of insured,
and had not attended him in his last sickness, was not compe-
tent to express his opinion as to whether death was the result
of accident or design.

HUMPHREY, BURNETT & HUMPHREY, FOR APPELLANT.

George F. Beard in September, 1897, procured a policy on
his life, in the Manhattan Life Insurance Company. The pol-
icy on its face provided that:

"If within two years, the insured die by his own act, sane
or insane, this policy shall be void, and all payments made
upon it shall be forfeited to the company, except that the.

company in that case will pay for its surrender the legal net reserve at the time of his death."

That Beard's death was the direct result of his own act there ought to be no doubt. It appears in evidence that he had been out of employment since December, 1898, or January, 1899, and his wife and parents had been furnishing him with small sums of money from time to time. He was a confirmed inebriate, and used morphine in conjunction with whisky. Before leaving St. Louis, he requested his wife to have his body cremated if he should die. He went to Memphis in June, 1899. His life there was profligate and his associates of the lowest. On July 31, 1899, he wrote the following letter to mother, sisters and brother:

Paducah, Ky., July    31, 1899.

*To my dear Mother, Sisters and Brother:*

"If I should happen to die suddenly, I want you to telegraph my *dear wife;* her address is 3021 Washington Avenue, St. Louis, Mo., and she will pay all the funeral expenses out of the insurance I leave her, and she already knows my other wishes, and I want you one and all to give her all the help she may need in getting the insurance and to be good and kind to her, for she has been the *truest, dearest* and *best wife* that ever lived, and I want you all to forgive me for the wrongs I have done; be sure and telegraph her at once and I trust you will grant this, my last request on earth, and I hope I will meet you all in a better world. Love to all.

Your son and brother,

FRANK BEARD."

"Telegraph Mrs. Jennie Beard, No. 3021 Washington Ave., St. Louis, Mo."

And on the same day he wrote to his father a letter almost word for word the same as the foregoing.

He carried these letters in his pocket and carried his life policy, also in his pocket.

When his premium fell due, August 30, he wrote to the company and asked an extension of thirty days' time which was granted. He died September 10, 1899. A few days before his death, he forged a draft addressed to a steamboat company at Clifton, Tennessee, purporting to have been drawn by the clerk of the boat for $50, payable to himself with which he paid his hotel bill of $13.50 and received from the hotel company the balance in money, which paid his room rent up to and inclusive of the next Sunday. On the night of that day he came to his room late. He did not appear to be intoxicated. He was not noticed the next day, but that night his hard

breathing attracted attention. His door was locked and latched inside. A boy was put over the transom, and Beard was found in bed and unconscious. Doctors were summoned, and they declare, unequivocally, that he was suffering with morphine poisoning. All efforts to resuscitate him failed. A partially filled bottle of morphine was found in his trunk.

From the foregoing facts, the conclusion that Beard took his own life is irresistible.

The plaintiff contends that even if he did take his life, yet he was insane and did not know what he was doing and did not know the physical effect of morphine.

The company replies to that by saying, that the contract for insurance sued on expressly provides that if he should die by his own act, sane or insane, within two years from the date of the policy, the policy should be void.

The proposition is, therefore, presented for the consideration of the court, whether a contract against self destruction can be entered into between parties who are *sui juris* in the absence of fraud, duress or mistake.

We further contend that the court in its instructions failed to give to the jury the law, as it is in this State.

We also claim that the court permitted incompetent evidence to go to the jury, especially in permitting the widow of deceased to make the most confidential communications both from and to her husband, and to state the contents of letters which had passed between them.

### AUTHORITIES CITED.

Mut. Life Ins. Co. v. Davies' Exr., 37 Ky., 552; Biglow v. Berkshire Life Ins. Co., 93 U. S., 284; Pierce v. Travelers' Life Ins. Co., 34 Wis., 389; Ritter Case, 169 U. S., 156; Civil Code, sec. 606; Mutual Benefit v. Davies, 10 Ky. Law Rep., 580; Haynie v. Knights Templars & Masons Life Indemnity Co., 41 S. W. Rep., 464, decided by supreme court of Missouri.

GREER & REED, ATTORNEYS FOR APPELLEE.

It is alleged in the petition and not denied in the answer, that the company having extended the time for the payment of last premium until September 30, 1899, and prior to that date and after the death of insured, the plaintiff, Jennie E. Beard paid the premium with interest, and which amount was received by the company after it had been notified of the death of George T. Beard who died September 10, 1899, and that said defendant with the full knowledge and information, and after it had investigated the facts and circumstances of her

husband's death, and the time and place thereof, did acknowl-
edge the receipt thereof, and did thereby continue in force
the said policy for plaintiff's benefit, all of which is alleged
and not denied. By the pleadings, the burden of proof was
put upon the defendant company.

The proof shows that Beard had once been in the steamboat
business and a clerk on the river, was a good penman and
business man, and a graduate of a college and a man of good
business capacity, but for some months prior to his death he
had undergone a change. Had contracted the morphine hab-
it and become a morphine fiend, and was otherwise afflicted;
complained of his heart, throat and ears; had to sit up in
his chair and sleep; could not lie down; used cocaine as
well as morphine and whisky. Had threatened to take his
wife's life; had hallucinations; talked like a mad man about
his mother; supposed he had a large estate in Mexico, and pos-
sessed large sums of money, and was trying to buy a home
for his wife, and said and did many things showing that
he was a mental wreck.

We claim there was no error in the instructions—that the
widow was not permitted to testify to any confidential com-
munications, and that if she had not testified at all there
is sufficient proof to sustain the verdict of the jury.

## AUTHORITIES CITED.

Mut. Ben. Life Ins. Co. v. Davies' Exr., 10 R., 580; Ins., Co.
v. Terry, 15 Wallace, 580; Manhattan Life Ins. Co. v. Brough-
ton, 109, U. S. 131; Mutual Life Ins. Co. v. Lenbrie, 71 Fed.
Rep., see note for collection of authorities, 50 Am. St. Rep.,
441; Accident Ins. Co., v. Crandall, 120 U. S., 531; May on
Ins. (2d ed.) sec. 325; Sharland v. Washington Life Ins. Co.,
101 Fed. Rep., ——; Ritter v. Mutual Life Ins. Co., 70 Fed.
Rep., 959; Walcott v. Metropolitan Life Ins. Co., 33 Am.
State Rep., 923; Kelly v. Mutual Life, &c., vol 109, Fed. Rep.,
57 (advance sheets) St. Louis Mut. Life Ins. Co. v. Graves,
6 Bush, 268 and 3d Joyce, page 2661; Brown v. Sun Life Ins.
Co., 57 Southwest Rep., 415; Jones on Evidence, 3d vol. sec. 76;
Elswick v. Com., 13 Bush, 155; Civil Code, sec. 113, sub-
sec. 4.

## WAIVER.

As to the acceptance by the company of the premium after,
and with full knowledge of circumstances of death of Beard
as alleged in the petition and not denied. Phœnix Ins. Co.

v. Lansing, 15 Neb., 494; (20 N. W. Rep., 22) Germania Ins.
Co. v. Rudwigg, &c., 3 Ky. Law Rep., 723.

It was an impossible and not enforcible contract to agree
not to commit suicide while insane. See Kelly v. Mutual Life
Ins. Co. of N. Y. Advance Sheets Fed. Rep., 57 vol., 109.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

The life of George F. Beard was insured by appellant
by a policy issued August 30, 1898. , The assured died
September 10, 1899, while the insurance was in effect.   The
policy contained this provision:  "If within two years the
insured die by his own act, sane or insane, this policy shall
be void, and all payments made upon it shall be forfeited
to the company, except that the company will, in that
case, pay for its surrender the legal net reserve at the
time of death.   Any indebtedness of the company, togeth-
er with the balance, if any, on the current year's premium,
will be deducted in any settlement of this policy."   The
circumstances attending the death of the insured indicate
that it was caused by an excessive dose of morphine taken
with suicidal intent.   Evidence as to the sanity of the
insured was introduced upon the trial.   It tended to show
eccentric conduct at times, which some of the witnesses
thought was due to insanity, but which appear as probably
to have been due to his intemperate habits, and a gener-
ally demoralized condition, resulting from being out of
employment and involved in some financial embarrass-
ments.

The principal question presented by this appeal is in-
volved in the instructions given and refused.   Those given
precluded a finding for the company unless it made it to
appear satisfactorily that the assured "by his own volun-
tary act came to his death by committing suicide with the
intent and purpose of destroying his own life."   And the

jury were further instructed: "And before you can find
for the defendant you will have to further believe from
the evidence that if such assured destroyed his life, that
he possessed at the time sufficient mind and understand-
ing to know the nature of the physical act he was about to
commit, and that he possessed sufficient will power at the
time to refrain from taking his own life." The company
presented two theories upon which it asked instructions,
respectively: (1) That if the assured purposely destroyed
his own life while sane or insane, the recovery was limited
to the legal net reserve due on the policy at the date of the
death; and (2) that if the assured, "while sane or insane,
took and swallowed a large quantity of morphine, with the
intention of killing himself, and that he had sufficient
mental power at the time to know that it would cause his
death, and took it with that intention," then the law was
for the defendant company. These were refused.

The "suicide" or "self-destruction" clauses of life in-
surance policies have received not a harmonious construc-
tion by the various courts of last resort. The cases may
be classified under three general heads. The first and
earliest involved the construction of such clauses as vitiat-
ed the policy in event the assured took his own life by
"suicide," "at his own hands," or "self-destruction." How-
ever the courts may differ as to the correct construction
of such clauses, in this State we are committed to what
appears to be the most universal rule, and the one applied
by the United States supreme court, which is that self-de-
struction in such provisions means such destruction by a
sane person. Insurance Co. v. Graves, 6 Bush, 268; Insur-
ance Co. v. Terry, 15 Wall., 580, 21 L. Ed., 236; Insurance
Co. v. Broughton, 109 U. S., 131, 3 Sup. Ct., 99, 27 L. Ed.,

878; Ritter v. Insurance Co., 169 U. S., 140, 18 Sup. Ct., 300, 42 L. Ed., 693.

To obviate the effect of such construction, the insurers lately added a new clause to their policies, which may be designated as forming the second class of these cases, in which it is provided that self-destruction or suicide by the insured, while sane or insane, vitiated the contract, or at least reduced the sum payable to such item as the reserve fund apportionable to the policy, or to a refunding of the premiums collected on it. This second class of case has also been before this court for consideration. Insurance Co. v. Davies' Ex'r, 87 Ky., 541 (10 R. 577) 9 S. W., 812. In the case just cited the policy provided, "in case he shall die by his own hand while insane," the company agrees to refund the premiums. Following and approving Biglow v. Insurance Co., 93 U. S., 284, 23 L. Ed., 918, this court held: "It may now be regarded as well established that intentional self-destruction will avoid a policy containing conditions like this, whether the act was committed voluntarily or from irresistible impulse, unless the mind of the insured was so far gone when he took his life as to render him unconscious that he was taking his life at the time he committed the act." We do not deem it necessary to restate the reasonings upon which these decisions are based. They are elaborately discussed in the opinions. It is sufficient to determine the class to which the policy in question belongs, and then apply the doctrine setting apart that class. The third class arises out of constructions to be placed upon additional clauses added to the suicide proviso, e. g., whether the self-inflicted injury were "voluntary or involuntary, while sane or insane." Haynie v. Indemnity Co. (Mo.) 41 S. W., 464. The case at bar, in our opinion, belongs to the second class herein

described.    It is therefore unnecessary to now consider the validity of such clause as that last quoted.    It is not here.    Therefore the court properly refused to give an instruction apparently predicated upon the idea involved in that clause (instruction Z offered by defendants).

The instructions given, though, were such as would have been proper in, and as are sustained by authorities under, the first class of cases named.    They preclude a forfeiture of the insurance if the self destruction occurred during, or was the result of, an insane impulse.    So do these instructions.    Their effect is to destroy one feature of the contract, which this court has held (87 Ky. 541), supra, was a legal provision; that is, the feature of self destruction while insane.    The court construes the term "self destruction," or "death by his own act," to mean that the act is not his if he has not mind enough to know what he is doing.    In such event the act is to be regarded as an accident.    But, although the insured may not be able from mental derangement to know the extent of his offense, that it is a crime, or even that it is wrong, and although his will power may be for the time subverted by one or more of his other faculties, whether by their derangement or not, if he has mind enough to know that the act would probably result in his death, and he inflicts it with that intention, it is a cause against which the company has not insured.

There are various degrees of insanity recognized by medical men and by the courts.    Partial insanity may be such as to leave the mind capable of fully comprehending the nature of an act, and of its moral effect, and with the will to do or abstain from it.    Excessive morbidity may so far affect the disposition as to overcome the instinctive desire to live, yet leave the patient with mind to under-

stand the nature and consequences of the act of self destruction, and with will power to execute his resolves. Hallucinations may indicate a degree of insanity. They need not necessarily derange the understanding of the act of suicide, or impair the will with reference thereto; yet they may be such as to impel the subject to brave all the consequences of his act, which are fully realized, rather than suffer the ills conjured by his diseased imagination. The normal nature instinctively desires life. Such lives are sought as the subject of insurance. We perceive no reason why the parties might not contract that if the disposition of the insured becomes abnormal by mental derangement, thus increasing the probabilities of self-destruction to the extent that his instinct for life may be subordinated by his disease, the insurance shall cease. The insured is not bound to accept such a contract. But, if he does, why should it not be enforced? We are of opinion that the instructions offered by appellant, presenting this view of the law should have been given in lieu of those given by the court.

On the trial the widow of the deceased, the beneficiary under the policy, was permitted to testify to numerous conversations with her husband, to facts learned from him, and to the contents of letters written from one to the other. Under subsection 1, sec. 606, Civ. Code Prac., providing: "Neither a husband nor a wife shall testify, even after the cessation of their marriage, concerning any communication between them during marriage,"—all the foregoing testimony was incompetent; and, under subsection 2 of section 606, she was likewise incompetent as a witness to testify in her own behalf as to acts done by, or transactions with, the decedent.

The circumstances about the death of the insured were

such as to admit of the theory of suicide. It might, though, have been an accident. On the trial, a physician introduced as an expert on the subject of insanity, after testifying about the indication of certain symptoms of insanity, and that in his opinion, if the deceased showed these symptoms, he was insane, was asked whether, in his opinion, the death was the result of accident or design, and was permitted to answer. This was error. The witness did not see the body, nor was he in attendance on his sickness. It was competent for him to say what was the probable effect of certain drugs, and what state of mind, as to sanity or insanity, certain symptoms would indicate. But whether the act of the deceaed in taking the drug was by design or accident was not the subject of expert testimony. That act was an issue to be solved by the jury upon all the evidence.

For the reasons indicated, the judgment is reversed, and cause remanded for a new trial not inconsistent herewith.