### Schrodt's Executor, et al. v. Schrodt, et al.

(Decided June 18, 1918.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

Wills—Contest—Sufficiency of Evidence—Mental Incapacity— Undue Influence.—In a will contest, evidence of undue influence examined and held insufficient to take the case to the jury.

DODD & DODD for appellants.

O'DOHERTY & YONTS and R. H. LUCAS for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

This is a contest over the will of Mary M. Schrodt, who died a resident of Jefferson county, on May 4, 1916. The grounds of contest were mental incapacity and undue influence, and both issues were submitted to the jury. The jury found that the will was obtained by

undue influence. Judgment was entered accordingly and the propounders appeal.

At the time of her death testatrix was 74 years of age and unmarried, and left surviving her one sister, Emma S. Butterweck, three brothers, Wm. Schrodt, John T. Schrodt and James Schrodt, two nieces, Florence Barnes and Estella Marr, and one nephew, George J. Schrodt, Jr., children of her deceased brother, George J. Schrodt, and two nieces, Mamie Schrodt Corbin and Alice Singer, the children of her deceased sister, Alice Schrodt Singer. The property of the testatrix consisted of her home in Anchorage, $2,107.00 on deposit in the German Bank, and two real estate bonds on notes, one for $750.00 and another for $500.00, and household effects worth about $20.00. By the will in question, which was wholly in the handwriting of the testatrix, and was made on February 19, 1916, she devised the home and deposit in the German Bank and the real estate bond or note for $750.00 to her sister, Emma S. Butterweck, absolutely. She further bequeathed the $500.00 bond or note to Mrs. Butterweck for life, with remainder to her son, Louis Butterweck. She also bequeathed the sum of $300.00 to her brother, Wm. Schrodt, and appointed Daniel Reidhar her executor.

For a number of years the testatrix had lived alone in her Anchorage home. The lower part of the house was sometimes rented out. Up to the time of her death, her sister, Alice Schrodt Singer, also lived at Anchorage. After the death of her sister, her husband, Edward Singer, married again, and Mamie Corbin and Alice Singer, the children of Alice Schrodt Singer, continued to live with their father and stepmother. Alice Singer, who is now sixteen years of age, frequently visited the testatrix and assisted her in her work and the testatrix was very fond of her. While the testatrix was on friendly terms with her other relatives, they rarely visited her, and their relations were not intimate. On February 4, 1916, the testatrix wrote a letter to her sister, Mrs. Butterweck, stating in substance that she had been feeling bad and would come in the next week and stay a while with her hoping to feel better. She further told her sister to let her know if she could come for her and that she would be ready. On February 6, 1916, Mrs. Butterweck and her son secured an auto-

mobile, went to Anchorage and took the testatrix to their home. A few days later the testatrix sent for Mr. Reidhar and asked him if he would act as her executor. He consented to do so if no bond was required. On February 19, 1916, the testatrix told Mrs. Butterweck that she desired to make her will and requested Mrs. Butterweck to get paper and ink and someone to act as a witness. Mrs. Butterweck furnished the paper and ink and telephoned to her son, Louis, to get a witness. Louis notified Robert Miller, who then went to the Butterweck home and was admitted by Mrs. Butterweck and shown into the room occupied by testatrix. At that time the testatrix had written perhaps three lines and finished writing the will in his presence. During that time Mrs. Butterweck came in and out of the room. When the will was finished Miller affixed his signature as a witness. Thereupon the testatrix delivered the will to Mrs. Butterweck and told her to put it away. Mrs. Butterweck didn't know the contents of the will until she asked her to examine it about two weeks later. It further appears that the testator had been suffering for some time from a cancerous or tubercular affection of her breast, but had concealed her disease from all the members of her family. On March 22 Dr. Chas. H. Witkach, a physician, was called in. He then discovered Mrs. Schrodt's condition and continued to treat her until her death, on May 4, 1916.

Briefly stated, the evidence for contestants is as follows: C. L. Russell, who had been a tenant of testatrix since October, 1915, and who saw her every day, until her departure from Anchorage, on February 6, 1916, gave it as his opinion that the testatrix, about Christmas, began to fail physically and mentally, and did not have sufficient mental capacity to make a will on February 19, 1916. He based his opinion on the fact that the testatrix would sometimes take no interest in the conversation and get off on something else, but if you would call her attention to it she would come back to the subject under discussion, and on the further fact that he saw testatrix pick up sticks and trash in the yard and sometimes pile it up and sometimes carry it up stairs, and did not keep what he would call a good fire. He further testified that testatrix was fond of Alice Singer and said to him more than once, "well, when I am gone,

I will remember Alice," but did not say in what way she expected to remember her.    Ella B. Russell, wife of C. L. Russell, testified that she saw testatrix very frequently and that the day testatrix left she seemed weak in mind.    She also gave it as her opinion that testatrix was not mentally capable of making a will, basing her opininon on the fact that the testatrix did not keep a good fire and did not eat enough.    This witness further testified that testatrix always spoke of her brother in an affectionate manner and was very fond of Alice Singer. She never heard testatrix make any statement about what she intended to do with her property.    Sallie Morris, who resided at Anchorage, and had known testatrix for several years, and had lived in the house with her for a while, and had seen her several times since, testified that testatrix was peculiar, that she took no pleasure in life.    She further stated that testatrix was frail and that her mentality was weak.    She too gave it as her opinion that testatrix, when she last saw her, did not have sufficient mental capacity to make a will. She also testified that the Singers were going to move into the home of testatrix and the testatrix stated that she knew that her sister would object, that Louis Butterweck came out there and said that it would never do in the world for the Singers to move in there.    That happened about two years before she testified.    Margaret Morris, a music teacher, who had known testatrix six or seven years, testified that she called on her just before she left Anchorage and found her in very poor physical condition.    She also saw her about the middle of February.    At that time she was not competent to attend to any business.    John T. Schrodt, a brother of testatrix, said that he saw testatrix for the last time in November, 1915.  At that time she was in feeble health. After that time he made no effort to see his sister until four days before her death.    James Schrodt, another brother, testified that he saw testatrix in June or July, 1915, and on another occasion three or four weeks after she had gone to the home of Mrs. Butterweck.    At that time she was nervous and had to be assisted to and from her bed.    He would not say that she was crazy, but thought there was a weakening in her mental faculties. He also gave it as his opinion that she was not competent to make a will.    Mamie Singer Corbin, a niece of

testatrix, saw testatrix in the summer of 1915, and on another occasion in the middle of April, 1916, two months after the will was made. Her association with the testatrix was just casual. At that time the testatrix was weak mentally. In her opinion the testatrix was not competent to make a will. Alice Singer, a niece of testatrix, testified that she used to run errands for testatrix and help her get up her coal and kindling. Testatrix was never stout. When she called on testatrix, about the middle of April, she was weaker then than she had been before. She then lay down for part of the time and part of the time was sitting up. At that time she noticed only a little change in her memory, not much. Testatrix told witness that she should have money to finish her education and study art, but didn't say anything about giving her the money. Florence Schrodt Barnes testified that she knew nothing about the physical or mental capacity of the testatrix. Mrs. Edward Singer testified that she was the second wife of Ed. Singer. She saw testatrix during the fall and winter of 1915, and noticed that she was failing very fast. She didn't seem, at that time, like she was in former days. The change in her mental condition was manifested by the fact that she arranged for the Singer family to move in and then called them up and said that she had changed her mind. In the opinion of witness, testatrix was not competent to make a will. Mrs. Birdie Rooksby testified that she lived in the house of testatrix for two years and eight months and moved away in 1915, but never saw her after that. Testatrix's health was failing but she never noticed any change in her mental power. Edward Singer testified that testatrix invited him and his family to come and live with her. He did not move in because testatrix called them up and said that she had changed her mind. He saw testatrix in January, 1916. At that time she was both physically and mentally weak. She had gotten so that she went up and down stairs with difficulty. Her mental condition was not very good. In his opinion testatrix did not have sufficient mind and memory to make a will. He based his conclusion on the fact that she changed her mind about having him as a tenant, and on one occasion her dress caught fire in the yard. Another reason was that she had very little to eat. All of these witnesses testified to the affection existing be-

tween testatrix and Alice Singer. There was also evidence by certain experts that the letters in two or three words in the will presented the appearance of having been changed by another person or by a pen different from the one used by the testatrix. Dr. H. H. Grant testified in substance that any long continued disease, especially if it was progressing and getting worse, makes the patient less capable of interesting himself in life and materially affects his judgment, and while it might possibly affect one's mind, it would not necessarily do so.

On the other hand, Louis Butterweck, the Misses Moses and the attending physician all testified to facts tending to show that testatrix talked and acted in an intelligent manner and was fully capable of making a will. Not only so but the letter written on February 4 was itself clear and intelligible. When testatrix reached the home of Mrs. Butterwick she was not then confined to her bed, but moved around the house. Furthermore the will itself, which was written by the testatrix, showed very clearly that she knew and remembered every item of property which she then possessed. It developed on the cross-examination of Mrs. Butterweck that she did not notify her brothers of her sister's condition until about three weeks before her death, but she explained that her failure to do so was due to the fact that her sister requested her not to notify them. Mrs. Butterweck and her son both testified that they never told the testatrix not to permit Mr. Singer's family to move to her house.

It will be observed that the only evidence of mental incapacity consisted of the opinions of non-expert witnesses based on the fact that the testatrix permitted her mind to wander from the subject under discussion, and that she did not maintain what the witnesses considered a good fire or provide herself with nourishing food. We have frequently written that where the facts relied on are insufficient to show mental incapacity, the opinions of non-expert witnesses based thereon are likewise insufficient for that purpose. Clark, et al., v. Young's Ex'x, 146 Ky. 377, 142 S. W. 1032; Bush v. Lisle, 89 Ky. 393, 12 S. W. 762; Hildreth v. Hildreth, 153 Ky. 601, 156 S. W. 144. Very frequently the person to whom we are talking, as well as the subject under discussion,

is not sufficiently interesting to hold our attention. Hence if the mere fact that we permitted our minds to wander from the subject under discussion were sufficient to show mental incapacity, it would be an easy matter to establish such incapacity. Nor can the fact that testatrix did not maintain a sufficient fire or provide herself with sufficient food, in the opinions of the witnesses, be regarded as evidence of mental incapacity. Here the whole estate of the testatrix did not amount to more than $6,500.00, and it was therefore necessary for her to practice very strict economy in order to conserve her estate, and her practice of economy under these circumstances tended to show a well balanced mind rather than mental incapacity.

The only circumstances relied on to show undue influence are the fact that Mrs. Butterweck did not advise her brothers of her sister's condition until about three weeks before her death, and that Louis Butterweck objected to the Singers moving into the home of the testatrix, and the testatrix in response to his suggestion declined to permit the Singers to become her tenants. When we consider the fact that the testatrix was suffering from a disease which she had studiously concealed from all the members of her family, and that she objected to her brothers being sent for, we see no evidence of undue influence because Mrs. Butterweck complied with her request. The same is true with respect to the suggestion made by Louis Butterweck that it would never do for the Singers to move into the home of the testatrix. Mr. Singer's first wife, who was a sister of the testatrix, was then dead. Mr. Singer had married again. The testatrix knew of this fact and whether the impropriety of the arrangement was suggested by Louis Butterweck or not, may have concluded that the arrangement was not for the best. Undue influence is such influence over the mind of the testatrix as destroys her free agency and constrains her to do against her will what she would otherwise refuse to do. Any reasonable influence obtained by acts of kindness or by appeals to the feelings and understanding, and not destroying free agency, is not undue influence. Watson's Exor. v. Watson, 137 Ky. 25, 121 S. W. 626. There are few of us indeed who do not at some time follow the suggestions made by members of our families, and undue influence

can not be predicated on this fact where the suggestion is not unreasonable. Were we to uphold the verdict in this case, the effect would be practically to nullify the statute giving to our citizens the power to dispose of their property by will, for in only rare and exceptional instances would it be impossible to find as much evidence of undue influence as was shown in this case. At most the fact relied on tended only to excite suspicion and were wholly insufficient to take the case to the jury. Hildreth v. Hildreth, *supra*.

If, upon another trial, the evidence be substantially the same, the trial court will direct the jury to return a verdict sustaining the will.

Judgment reversed and cause remanded for a new trial consistent with this opinion.