## Bailey, Administrator, et al. v. Bailey, et al.

(Decided May 30, 1919.)

### Appeal from Larue Circuit Court.

1. Wills—Undue Influence.—Undue influence is any influence obtained over the mind of the testatrix to such an extent as to destroy her free agency, and to constrain her to do against her will what she would otherwise refuse to do, whether exerted one time or another, directly or indirectly, if it so operated upon her mind at the time of the making or execution of the will.

2. Wills—Undue Influence.—Mere general or reasonable influence over the testatrix is not sufficient to invalidate a will; to have this effect the influence must be undue, that is not right or not proper. Acts of kindness, attention, advice, suggestions or appeals to the feelings, or understanding, not destroying the free agency must not be mistaken for undue influence.

3. Wills—Mental Capacity.—The test of mental capacity sufficient to make a will is that the testatrix have sufficient mental capacity to take a survey of her property, to know its value, to know the objects of her bounty and her duty to them, and to dispose of her property according to a fixed purpose of her own.

4. Wills—Mental Capacity.—The fact that a testatrix at times addressed her son Arthur as Wilbur, the name of a deceased son,

- is not evidence of mental incapacity, the names being phonetically the same.

5. Wills—Mental Capacity.—The fact that testatrix, who was generally known as "Bettie Bailey" signed her name as "Bettie Elizabeth Bailey" is no evidence of mental incapacity, but rather an exercise of caution and care to have her name correctly appear in her will. Many of our proper names are the result of contraction of the original. Bettie is the diminutive of Elizabeth.

6. Wills—Mental Capacity.—Under the laws of this State citizens of the requisite mental ability are privileged to dispose of property by will, according to their desires, and the opinion of a jury as to what might be a proper and just division will not be substituted for the will of the testatrix.

CHARLES WILLIAMS, L. B. HANDLEY and E. W. CREAL for appellants.

OTIS M. MATHER and H. L. JAMES for appellees.

CHAS. T. CREAL, guardian ad litem, for Ted and John Bailey.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

Bettie Bailey, by her will dated February 8, 1916, and duly admitted for probate in the Larue county court, left her entire estate, of an estimated value of from $4,000.00 to $7,000.00 to her three youngest children, Turner, Ted and John, with a provision that they pay to her four oldest children, Arthur Bailey, Dick Bailey, Lela Bernard and Joe Bailey, $300.00 each. There was a further provision that her youngest child was to have the crops from the farm for the year 1916.

Suit was filed by one of the older children contesting the will on the grounds of undue influence and mental incapacity, and upon a trial the jury found that the will so admitted to probate was not the will of Bettie Bailey.

The signature to the will appears as "Bettie Elizabeth Bailey," to which reference will later be made. The will also contained the following pencil notation, "B. Carter see to this."

From the judgment setting aside the will this appeal has been prosecuted.

The evidence on behalf of the contestants may be summed up as follows: At the time testatrix signed the will she said to one of the witnesses, "Brother Brown, I am nervous this morning; I don't know whether I can hardly write my name or not."

John Bailey, one of the favored devisees, sent for the Rev. A. L. Brown to witness the will and when he reached the house he found Turner Bailey and G. B. (Bee) Carter there. Testatrix stated that she wanted Carter to see that the will was carried out. Carter, Turner Bailey and John Bailey remained with testatrix after the will was signed.

Testatrix asked the Rev. Brown how to spell her name. She had told Carter on a previous day that she wanted him to sign her will; the evidence is not clear as to the order in which the names were signed to the will, nor just when the notation above referred to was made.

Testatrix had made a will some nine or ten years previously, in which she divided her property equally among her children, with the exception of John, who, being the youngest child, was given more than the others. The older children, all of whom testify for contestant, did not know of the last will until after the mother's death, though most of them lived in the immediate neighborhood and were on friendly terms with her, and had lived in the house with her at different times prior to the making of the will, and she had made the remark, both before and after the date of the will, that she wanted her farm divided equally among her children.

The mother had suffered with tuberculosis for several years, and during the last few months of her life the least thing would excite her; she was trembly; B. Carter was at the house sometimes two or three times a day and seemed to have some influence with testatrix, and when it was suggested that her children had better run her business instead of listening to B. Carter, she said she was afraid she might make B. mad; that he might do her some damage.

The mother did not put her foot to the ground after Christmas, 1915, except in the following summer she was carried to the yard to enable her to get fresh air; in February, 1915, she was "awful forgetful," and frequently called her daughter by the name of Lydia, a deceased aunt; also called her sons, especially Arthur, by the name of Wilbur, a son who had died about eight years before. Her memory had been failing for about a year before her death. The contesting children, in their judgment, think the mother did not have sufficient mental capacity to make a will and never saw her name written Bettie Elizabeth Bailey.

All the children were present at a family reunion Christmas, 1915, and the mother said she was proud to see them all so big and healthy, and wanted them all to be good children and to meet her in heaven.

Joe Bailey, one of the contestants, states that in February, 1916, his mother was not capable of doing any kind of business. B. Carter could get her to do most anything he wanted and B. would go with the younger boys to New Haven to get whiskey.

Briefly stated the above is the substance of the testimony of the four older children.

The will was written by a deputy county clerk from a memorandum handed him by Turner and John Bailey, which memo seems to have been in the handwriting of the testatrix. His first draft was returned because it did not suit the mother and he made certain changes in it.

The testimony of the remaining witnesses, six in number, consisted mainly of statements made to them that Arthur was her favorite son. No one of these witnesses attempts to testify as to any mental incapacity or undue influence.

Undue influence is any influence obtained over the mind of the testatrix to such an extent as to destroy her free agency and to constrain her to do against her will what she would otherwise refuse to do whether exerted at one time or another, directly or indirectly, if it so operated upon her mind at the time of the making or execution of the will. Watson's Exor. v. Watson, 137 Ky. 25; Brent v. Fleming, 165 Ky. 356; Jones v. Beckley, 173 Ky. 831; Talbott, Extx., et al. v. Giltner, 179 Ky. 571; Robinson v. Davenport, Exor., 179 Ky. 598; Schrodt's Exor., &c. v. Schrodt, &c., 181 Ky. 174.

Mere general or reasonable influence over the testatrix is not sufficient to invalidate a will; to have this effect the influence must be undue, that is, not right or not proper. Acts of kindness, attention, advice, suggestions or appeals to the feelings, or understanding, not destroying free agency must not be mistaken for undue influence.

Measured by this definition we find nothing in this record indicative or suggestive of undue influence exerted over the mind of testatrix. As said in Childers' Extx. v. Cartwright, 136 Ky. 498:

"It is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was

a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised. The law permits the owner of property, who is of sound mind and disposing memory, to transmit his property by last will and testament in such a manner as pleases him, and juries are not permitted to make for him a will that accords with their idea of justice and propriety; nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire."

The evidence as to mental incapacity is equally as unsatisfactory and unconvincing.

The test of mental capacity sufficient to make a will is that the testatrix have sufficient mental capacity to take a survey of her property, to know its value, to know the objects of her bounty, and her duty to them, and to dispose of her property according to a fixed purpose of her own. Meuth v. Meuth, 157 Ky. 793; Robinson v. Davenport, Exor., *supra*.

In Wise, &c. v. Foote, &c., 81 Ky. 10, the court says:

"Testable capacity does not rise to that high degree of understanding and ability necessary to render a person capable of making a contract where the parties deal at arm's length, but exists where the testator has mind and memory enough to understand that he is selecting the persons whom he wishes to have his property, and to know his property, and the natural objects of his bounty, and his duties to them and the persons upon whom his property is bestowed by the testamentary paper which he signs."

Great stress is placed upon the fact that testatrix at times addressed her son Arthur as Wilbur, a deceased son. These names are phonetically similar, and we do not think it strange the mother should have confused them. Indeed this is not an unusual occurrence. Few people there are who have not made a like mistake, and what mother with a plurality of children has not called one child by another's name, especially when her thoughts at times must naturally have turned to her deceased son. It is a singular coincidence that Mrs. Bernard, the oldest child, in her testimony on behalf of the contestants, falls into the same error and when her attention was called to the fact she says: "I just made a mistake; I meant Arthur; I didn't know I said Wilbur."

In referring to a similar point in Schrodt v. Schrodt, *supra,* the court says: "Very frequently the person to whom we are talking, as well as the subject under discussion, is not sufficiently interesting to hold our attention. Hence if the mere fact that we permitted our minds to wander from the subject under discussion were sufficient to show mental incapacity, it would be an easy matter to establish such incapacity."

The point is made that testatrix was known as Bettie Bailey and transacted business in that name, and that her name is not Bettie Elizabeth Bailey. When it came to the signing of so important an instrument as a will, it was no more than natural she would turn to those present, as she did, and ask them how to sign her name. The witnesses were seemingly as much in doubt on the point as she was, so she finally signed both names.

Many of our present day proper names are the result of contractions and corruptions of the original. Bettie is the diminutive of Elizabeth, and the use of the two names shows rather the exercise of caution and propriety than of mental incapacity. It was her evident desire and determination that she affix her proper name, and to remove all doubts she used both her Christian name of Elizabeth and the contraction Bettie, the latter being the name by which she was generally known.

B. Carter, of whom complaint is made, was as companionable and friendly with the older children as the younger ones. As their father's friend he was interested in their welfare; both he and his wife were frequent visitors at the Bailey home, and his desire seems to have been to render the family such advice and assistance as he could. His efforts would appear more deserving of approbation than reprehension, and we find nothing to indicate that he ever exercised any influence over testatrix. The older children were married, the younger ones single. There had been some feeling between the mother and some of the older children about a hog deal. Contestant was anxious to get his mother to deed him one and one-half acres of her place a few months before the execution of the will. Her mentality was such at that time that he was then willing to accept her deed, and about this time he did in fact make a trade with her for a cow. This conduct is rather inconsistent with his present claims of incapacity on her part.

Under our statutes citizens of the requisite mental ability are privileged to dispose of property by will, according to their desires, and the opinion of a jury as to what might be a just and proper division will not be substituted for the will of the testatrix.

The evidence as to the want of mental capacity is furnished by non-expert witnesses, and we have written time and again that where the facts relied upon are insufficient to show mental incapacity the opinion of non-expert witnesses based thereon is likewise insufficient for that purpose. See Schrodt v. Schrodt, *supra,* and cases therein cited.

Many witnesses, neighbors, bankers, farmers, merchants, a preacher, the family physician, who had been such for thirty years, and friends of many years' acquaintance, testifying for contestees, state that testatrix was a woman of more than the average intelligence and ability, and in their judgment there had been no impairment of her mental faculties.

If the evidence upon another trial be substantially the same as on the first trial the lower court will direct the jury to return a verdict sustaining the will.

Wherefore the judgment is reversed and the cause remanded for a new trial in conformity with this opinion.