## New York Life Insurance Company v. Dean et al.

(Decided November 30, 1928.)

### Appeal from Oldham Circuit Court.

1. Insurance.—Clause in life insurance policy, limiting liability in event of self-destruction, whether insured be sane or insane, does not exonerate insurer, if insured at time he committed self-destroying act did not know, realize, or contemplate consequences thereof or that it would result in his death.

2. Pleading.—Anticipatory matter set up in pleading by plaintiff will be treated as surplusage and given no more effect than if it had been entirely omitted from the pleading, since plaintiff is not required to anticipate and negative any defense that might be interposed.

3. Trial.—Where insurer, in action on life insurance policy, pleaded as a defense that it was liable only for premiums paid by reason of fact that insured had committed suicide while sane and when he had mind enough to know that act would probably cause his death, the denial of insurer's motion for burden of proof was erroneous.

4. Insurance.—In action on life insurance policy containing a clause limiting insurer's liability in case of suicide, evidence as to insured at time of committing suicide being so insane as not to realize or comprehend effect of his act or that it would probably result in death held insufficient for submission to jury.

5. Trial.—If, upon consideration of all the testimony, including collateral facts and circumstances, there is no reason for honest difference of opinion among intelligent men on the issue, peremptory instruction should be given.

WM. MARSHALL BULLITT, JOHN TARRANT, GAVIN H. COCHRAN and BRUCE & BULLITT for appellant.

ROBERT T. & WM CROWE and J. BALLARD CLARK for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On April 3, 1925, the appellant and defendant below, New York Life Insurance Company, issued a policy upon the life of William J. Dean, in which it agreed to pay upon his death, to the beneficiaries named therein, the appellees and plaintiffs below, Edwin W. Dean et al., the sum of $2,000. The policy contained this independent clause:

"*Self-Destruction.*—In event of self-destruction during the first two insurance years, whether the Insured be sane or insane, the insurance under this Policy shall be a sum equal to the premiums thereon which have been paid to and received by the Company and no more."

On October 27 of the same year the insured destroyed his life by shooting himself through the head with a pistol and from the effects of which he immediately died. Defendant declined to pay the policy, because of the above inserted clause contained therein, and plaintiffs brought this action against it in the Oldham circuit court to recover the amount thereof. In their petition they set out the above clause contained in the policy, and then alleged:

"That at the time the said William J. Dean shot himself he was so insane that he did not know he

was taking his life and did not know that the act which he was committing would probably result in his death."

The answer admitted the execution of the policy, and then set out the "self-destruction clause" that it contained, followed by the averment, that on October 27, 1925, the insured killed himself "while sane, and at a time when he had mind enough to know that the act he committed would probably cause his death." In another paragraph defendant offered to confess judgment for the amount of the premiums that had been paid on the policy, together with interest thereon. The reply denied that the insured destroyed his life "while sane or at a time when he had mind enough to know that the act he committed would probably cause his death." With the pleadings in that condition, defendant moved for the burden of proof, which the court overruled, and to which it excepted. At the close of all the testimony, it again moved for the closing argument to the jury, which the court overruled, and it again excepted. There was a verdict in favor of plaintiffs for the full amount of the policy, upon which judgment was rendered, and which the court declined to set aside on defendant's motion for a new trial, and it has appealed.

The errors relied on for reversal are (1), the refusal of the court to sustain defendant's motion for the burden of proof; (2), error of the court in overruling its motion for a peremptory instruction in its favor, made at the close of plaintiff's testimony and at the close of all the testimony; and (3), that the verdict is flagrantly against the evidence.

In disposing of error (1) it is necessary to make some brief observations on the extent of the defense based upon such clauses in life insurance policies. In the case of National Life Insurance Co. v. Watson, 194 Ky. 355, 239 S. W. 35, 35 A. L. R. 156, an epitomized history of what has come to be known as the "suicide clause" in life insurance policies was made, as was partially done in the prior case of Manhattan Life Insurance Co. v. Beard, 112 Ky. 455, 66 S. W. 35, 23 Ky. Law Rep. 1747. In those two cases, as well as numerous others intervening between them and in some prior to the first and subsequent to the last of them, this court announced its interpretation of such clauses against suicide (and similar expressions) "either sane ~r insa~ e"; and which in-

terpretation was and is that the clause furnishes a complete defense, unless the insured at the time of committing the act resulting in his death, "was so devoid of mind" at the time as to not know or realize the nature of his act and the physical consequences thereof, or, in other words, "that he did not know what he was doing and did not intend to commit the act which resulted in his death" (from the Watson opinion). That interpreted application of the defense, though firmly settled in this and a few other states, is contrary to the one given to such clauses by a large majority of other courts as will be seen in the annotations to the Watson case in the volume of 35 A. L. R. supra, beginning on page 166 and extending to and including page 187.

We are not now concerned with the question as to whether the majority or the minority rule of interpretation be the correct one, since, if for no other reason, the stare decisis doctrine admonishes us that we should not reject the minority rule after having so thoroughly aligned ourselves with the other courts adopting and applying it. Under that interpretation such clauses do not exonerate the insurer if the insured at the time he committed the self-destroying act did not know, realize, or contemplate the consequence of his act, or that it would result in his death. In other words, that the attempt in the clause to excuse defendant from payment of the policy if the insured was *insane* would not have that effect if his insanity was to the extent indicated. That being true, a pleading relying on such defense would be incomplete if it merely averred that the insured committed suicide, or if it also went further and averred that he suicided while *insane*, without averring the additional element to complete the defense under the minority interpretation; i. e., that at the time he did so, though insane, he possessed mind enough to realize and contemplate the results of his act and committed it with the intention to produce his death. If such allegations are necessary to a complete defense, it necessarily results from the rules of logic as well as those of good pleading that the burden would be on defendant to prove such pleaded complete defense if the facts contained therein were denied.

For the same reason, it is well settled by adjudications from this and other courts, as well as by text-writers on the subject, that a plaintiff is not required to

anticipate in his pleading setting up his cause of action any defense that might be interposed to it and negative therein such defense, and that, if he does do so, such anticipatory matter will be treated as surplusage and be given no more effect than if it had been entirely omitted from the pleading in which it appears, and which rule seems to be universally applied in actions on life insurance policies containing such clauses, as will be seen from annotations to the case of Starr v. Ætna Life Insurance Co., 41 Wash. 228, 83 P. 113, 4 L. R. A. (N. S.) 636, and annotations to the case of Red Men's Fraternal Accident Association of America v. Rippey, 181 Ind. 454, 103 N. E. 345, 104 N. E. 641, 50 L. R. A. 1006.

In the case of Philadelphia Life Insurance Co. v. Farnsley, 162 Ky. 27, 171 S. W. 1004, we had before us the question as to whether plaintiff, in a suit on a contract containing several clauses, should anticipate and avoid a defense contained therein in a separate and independent clause from the one containing the promissory obligation which was sought to be enforced, and we held that he was not so required, but that, on the contrary, it was defendant's duty to rely on it in his defensive pleading if he desired to avail himself of it. Such conclusion so reached in that case is in complete accord and in perfect harmony with general rules of good pleading as announced by recognized legal authors and as adopted and approved by the courts throughout the country.

Later cases from this court applying that rule of practice are, Anderson v. Greenville Coal Co., 205 Ky. 111, 265 S. W. 472, and Home Insurance Co. of New York v. Johnson, this day decided and reported in 11 S. W. (2d) ——. In the Anderson opinion in determining the legal effect of such anticipatory pleading, we said:

"It adds nothing to the petition, nor does it detract anything from it. A plea in avoidance of a defense naturally and logically should be made in a reply, and it was wholly unnecessary to encumber the petition with this matter in avoidance."

And in the annotations in volumes 4 and 50 L. R. A. (N. S.), supra, in dealing with this question of pleading in life insurance cases involving forfeiture clauses in the policy, the learned annotator says:

"It is well settled that in actions on life or accident policies the plaintiff need not allege that the

death or injury of the insured did not result from a cause which by the terms of the policy would relieve the insurer from liability.''

Many cases are cited wherein plaintiff anticipated in his original pleading many defenses to actions on the policy, and which were contained in it, other than that arising upon the ''suicide clause,'' and in all of them it was held that the pleading was bad and that the anticipated matter was pure surplusage and plaintiff obtained no advantage thereby; and, in the opinion in the Johnson case, supra, we announced the rule that such anticipations could not serve to deprive defendant of the burden of proof if he were otherwise entitled to it. Other cases to the same effect are cited in that opinion, and in the annotations supra, to the case in 4 L. R. A. (N. S.), the general rule, as applied in the Johnson opinion, is thus stated:

> ''In such cases the burden of proof is not put upon the plaintiff, even though his petition negatives the excepted causes of the death or accident stated in the policy, as such an allegation is unnecessary on his part, and he is under no duty to establish it by evidence. . . . In a very large number of cases where this rule of law is applied, the defense upon which the insurer relies to avoid the policy is suicide. And, whether the policy sued on is one of life or accident insurance, the authorities are agreed that it is the insurer's duty to prove that the assured took his own life.''

See, also, to the same effect, the text in 37 C. J. 607, sec. 394:

Some of the other numerous domestic cases in which the burden of proof, in cases like this one, was adjudged to be on defendant, are Mutual Benefit Life Insurance Co. v. Daviess, Ex'r, 87 Ky. 541, 9 S. W. 812, 10 Ky. Law Rep. 577; Manhattan Life v. Beard, 112 Ky. 455, 66 S. W. 35, 23 Ky. Law Rep. 1747; Masonic Life v. Pollard, 121 Ky. 349, 89 S. W. 219, 28 Ky. Law Rep. 301, 123 Am. St. Rep. 198; Modern Woodmen v. Neeley, 111 S. W. 283, 33 Ky. Law Rep. 758; Sovereign Camp v. Salmon (Ky.) 120 S. W. 358; Inter-Southern Life v. Boyd (Ky.) 124 S. W. 333; Metropolitan Life v. Maddox (Ky.) 127 S. W. 503; Commonwealth Life v. Hughes, 145 Ky. 650, 140 S. W.

1014; Sovereign Camp v. Ethridge, 166 Ky. 795, 179 S. W. 1022; Security Life Ins. Co. of America v. Duncan's Adm'r, 184 Ky. 443, 211 S. W. 758; National Life v. Watson, 194 Ky. 355, 239 S. W. 35, 35 A. L. R. 156; and Penn. Mutual v. Roberts, 207 Ky. 524, 269 S. W. 736.   In some of them it does not appear from the opinion upon which party the trial court adjudged the burden because it was accepted without complaint on appeal, but in the Daviess, Hughes, and Duncan cases complaint was made in this court, and we held that the court properly adjudged the burden on defendant, and in each of them the defense was based on a clause in the policy similar in all respects to the one involved in the instant case.

But it is insisted by plaintiffs' counsel that the Anderson case, supra, and those of Sovereign Camp v. Landrum, 158 Ky. 841, 166 S. W. 598, and Vicars v. Ætna Life Insurance Co., 158 Ky. 1, 164 S. W. 106, sustain the trial court in this case in adjudging the burden to be on plaintiff.   The Anderson and Vicars cases grew out of claims under accident policies, the promising clauses or sections of which expressly excluded bodily injuries "where intentionally self-inflicted, while sane or insane."  Under the universally settled rule that where such exceptions and exclusions are contained in the *same* section of the writing upon which the action is brought, proper pleading requires that they be negatived in the pleading of plaintiff declaring thereon, we held in those two cases that the plaintiff in each of them was required in his petition to negative that exclusion, and that being true the burden was on him to prove his negative allegation, if denied.   Moreover, if the insured under such accident policy *intentionally* inflicts injury or death upon himself, the loss would not result from such accidental causes against which the policy was issued; but, if such an injury was so inflicted, and at a time when the insured did *not* comprehend or intend the consequences of his act, then it would be an accidental one within the terms of the policy and for which a recovery might be had.   It is incumbent on plaintiff in a suit on that character of policy to bring his case by his pleading within its terms, and, if any fact necessary therefor should be denied, the burden would be upon him to establish it.   It is therefore patent that neither of those cases militate against the rule hereinbefore discussed, since this case is not brought to recover on an accident policy.

It must be admitted, however, that the Landrum case seems to support the contention of counsel for plaintiff. It was criticized in the Duncan opinion, but neither its approval nor its rejection was necessary for the purposes of that case, and no expression thereon was made. In so far as it holds that the burden is upon plaintiff in defenses to actions on life insurance policies based on the modern suicide clause contained therein, it is out of harmony with not only the universal doctrine and holding of courts generally on the particular question of practice, but likewise out of harmony with our numerous opinions supra, upon the same point; and for that reason it should no longer be followed, and it is hereby overruled. It results, therefore, that the court erred in overruling defendant's motion for the burden of proof, and which brings us to a consideration of error 2, relating to the merits of the case.

2. Before entering upon the discussion of error (2), it should be kept in mind that the issue was, not that the insured, W. J. Dean, was insane at the time he pulled the trigger of the pistol that sent the ball through his brain, but whether he at that time was *so insane* that he did not realize or comprehend the effects of his doing so, or that it would cause the pistol to fire and send the bullet through his brain, resulting in his death. We have hereinbefore seen that, unless the insanity was to that extent, no recovery could be had on the policy, notwithstanding the insured was *insane* at the time.

The testimony introduced was, in substance, that Dean at the time of his death was about 48 years of age, and was and had been for a considerable time local agent of the Louisville & Interurban Railway Company at La Grange. He was reared on a farm in Henry county that had been in his family for more than 100 years, and he was very much attached to it. He and some other heirs inherited it, and in an effort to preserve it in the Dean family he purchased the interests of the other heirs. He thereby became indebted to two banks and to an individual in the aggregate sum of between $6,500 and $7,000. One of the banks failed, and he could no longer get an extension of time from its receiver, which resulted in a suit to foreclose the liens on the farm and sell it in satisfaction thereof. Judgment had been obtained for that purpose, and the land was advertised for sale. He was unable to obtain the money with which to extinguish the

liens, or to obtain an extension by partial payment, and under such circumstances he grew morbid. He became much less jolly and talkative than formerly. He recognized his friends and talked to them intelligently and approached at least one person in an effort to obtain a loan. The individual creditor who held a third lien on the farm would most likely realize nothing therefrom on his debt, and he had threatened to attach the wages of the insured, all of which brought about the condition described by the witnesses. Insured continued to perform his duties as agent for his principal, and attended upon them punctually and regularly in the careful manner he had theretofore done and as required by his employment. Sometimes he would pass old acquaintances on the street without observing them, but when spoken to he would answer and converse with them, and he approached a deputy sheriff of the county, who he had learned contemplated resigning as such, with a view to obtain that position because it paid more than did the local agency for the railway company. That occurred a few days before the suicide, and to that witness he talked normally and intelligently, but to all of his acquaintances the fact that he was morose and somewhat depressed, resulting in a change in his former condition and habits, was observable; but none of the witnesses (except one to be hereinafter referred to) testified that according to their opinion he was insane, or that he did not know what he was doing, not even his son, the appellee, Edwin W. Dean. On the contrary, all of them who testified on the point stated their belief that he *did* know what he was doing upon the various occasions testified to after the morose condition was observable.

The coroner of the county, Dr. Connell, was introduced by plaintiffs, and he testified to a conversation he had with deceased some several days before his death, which occurred, either at the home of witness or at his office, and he gave it as his opinion that at that time the insured did not know what he was doing. In giving his testimony on that particular point, he said, "I do not think he did realize what he was doing at all from one or two reasons," which he proceeded to detail, and they were: First, that on the occasion referred to the insured had brought his young 4-year-old son to the doctor and insisted that the boy was afflicted with some kind of skin eruption, which the witness could not detect by artificial

light, the visit being made at night; and the second reason was that the insured on a prior occasion approached witness to become surety on insured's note, or to lend him some money, and because witness did not have any money to lend, or because, perhaps, his name on a note would be of little value, he concluded that deceased was so insane that he did not know what he was doing. The witness did not testify that the young son of deceased was not afflicted in the manner insisted on by the latter, but only that, if it was true, witness could not detect it by artificial light. It will first be observed that the testimony of that witness did not relate to the exact time of the suicide, but, waiving that point, an analysis of his only reasons for his opinion so thoroughly and completely refutes it as to eliminate his testimony on that issue of fact.

A merchant in La Grange by the name of Prewitt, who was a friend of insured, went to the depot of the railway company for which he worked about 6 o'clock on the morning of the suicide and found him removing ashes from the stove in the office, and a usual and normal conversation occurred between them. Witness went away and returned to the office a few minutes after 8 o'clock, and what occurred at that time is best told by himself when he said:

"I had an order for a suit of clothes to go to Anchorage, if I remember right it was about five minutes after eight, I fixed this suit of clothes up and went down on that side of the street and cut across by Downs' garage, I walked in the front door, and I noticed the door leading into the freight room was open, well, the first thought struck me that Bill (insured) wasn't there, when I saw that door open I knew he wouldn't leave that open, I come out and walked around the back part of the depot, I walked up on the platform and got hold of the doors and pulled them open, and Bill I guess he was standing ten feet to my left with his back to me just as I walked in, I says, 'hello Billy,' he kinder straightened up this way (Witness indicating), I saw him do this way (Witness indicating), put his hand in his coat, he never answered me, he went right on down the steps into his office and me after him, and there were some pigeon holes with papers in them where

he sold tickets there, I saw him put something in there, I didn't see the gun, I says, 'Billy, here is a suit of clothes that I want to send to Anchorage, I don't want to send it on the baggage car it is always full of water and it damages the suit,' I says, 'will you send it on the baggage car?' He never answered me, I says, 'I am going to lay it up here' and laid it up here, I didn't know what I was talking about, he never did answer me, I went on out and started on down the street back to the store, and on my way back I got to thinking about it, I says, 'there is something wrong with that fellow, that fellow is not acting right,' so when I got in the store my brother and Charley Davis were standing back by the stove talking, 'I says I saw something just now that scared me, I don't know whether it is my imagination or what,' they said, 'what is it?' I said, 'I believe Bill Dean is going to kill himself,' and then I told them what I saw, they said, 'Why didn't you take it away from him?' I says, 'that is a difficult proposition,' they said, 'you ought to have done something.' I said to my brother 'I will go back down there and if he did have a gun, I know where he put it and I will get it, and if I don't get the gun I will stay with him until time for him to leave,' he said, 'all right, go ahead.' So I went back, my package was still laying on the edge of the desk where I laid it, I thought to myself what am I going to say to get to see whether that was a gun or not, I said, 'Billy, I want to prepay that package to Anchorage,' I walked over and looked at the package, he had never made out a bill of laden for it, I says, 'I want to prepay it,' he never did answer me, he went over to this chair, he didn't set down, he was making out a bill of laden, while he was making out the bill of laden, I come over behind him where those pigeon holes were, I took my hand and felt in all of the pigeon holes and papers but there was no gun there, I thought well maybe I am wrong about that, maybe that wasn't a gun, I came on back and set down on the corner of his desk, the west corner of his desk, right by my package, he made out two or three bills of laden, when he made out one he would pick it up and wad it up and throw it down, when he made out the last one he wrapped it around a string, I happened to look over in the

corner and there was a rifle, looked like a twenty two rifle, I says, 'Billy, whose rifle is that?' He says, 'I don't know somebody left it there,' I looked up about that time, it was about twenty minutes after eight, I says, 'Billy that car will be in here in a few minutes,' I says, 'when it does, you are not feeling good and I am not either, I am going to get in my car and come down here and we will take a ride,' and he never did answer me, so he turned and walked out by the stove, and he turned around and in a few minutes he came back, I was kinder sitting in this position (Witness indicating) right on the edge of the desk with my left foot on the floor, he came over and didn't say anything, there was a tablet there I was sitting on it, he took and pulled it out from under me and opened the tablet and wrote it and then he turned it back this way kinder (shut it) and rubbed his hand over it, then he goes on out to where the stove was, stood there by the stove a few minutes and started up the steps leading into the freight room. I don't know whether there is three or four flight of steps, anyway from where I was sitting I could see the double doors back of the freight room, so he started up, I guess he had gotten about two steps, and when he did, I just eased down this way and started after him, he turned around and he comes back, and picks up a piece of paper and wads it up and throws it down, then he goes on back and started up the steps again in a hurry. I thought may be somebody was calling back to the door to get some freight, I had a plain view of him, he started on up and he got just half way to the freight room, he just turned absolutely to his right and dashed across, when he did I jumped and I run and I just got in the freight room just as he shot himself, I hollered at him, says, 'Billie' just that way.''

He then told about procuring the note written by deceased as detailed in his testimony, and that he delivered it to Dr. Connell, who produced it on the trial, and it was completely identified as the one given to him by the witness, Prewitt, although the latter testified that he was unable to identify the paper so produced by the witness Connell. Another witness testified that, immediately before the witness Prewitt made his second visit to the depot, he purchased of deceased a trip passbook, and

that the latter stamped each ticket therein as he had theretofore done and as his duties required, and that he collected therefor the usual charges. About twenty minutes before the insured shot himself, he had a telephone conversation with the superintendent of the railway company at Louisville, and that officer thus testified concerning it:

"Q. By telephone what was the last conversation? A. About twenty minutes.

"Q. At that time did he seem to recognize you —to recognize that you were his superior? A. Yes, sir.

"Q. What did you talk to him about? A. Freight waybill, he had one to send in, it was the custom for the agents to send the freight bills with all freight shipments and he had one to send in.

"Q. He knew you were talking to him about a waybill? A. Yes, sir.

"Q. All of his business was transacted through you? A. Yes, sir."

It is well known to the profession that mental capacity sufficient to make a will is not lacking if the testator has mind enough to take a survey of his property, to know its value, and the objects of his bounty and his duty to them and to dispose of his property according to a fixed purpose. In numerous cases appealed to this court, involving such necessary testamentary capacity, we held that the testimony, which in many of them was apparently stronger against such capacity than is the testimony we have recited to establish the insanity of the insured, did not sustain that ground of contest, and we directed an instruction to sustain the will. Some of those cases are Clark v. Young, 146 Ky. 377, 142 S. W. 1032; Cecil's Ex'r v. Anhier, 176 Ky. 198, 195 S. W. 837; Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 203 S. W. 1051; Bailey v. Bailey, 184 Ky. 455, 212 S. W. 595; Wiggington's Ex'r v. Wiggington, 194 Ky. 385, 239 S. W. 455; and Redeman v. Ruff, 196 Ky. 471, 244 S. W. 910. We will not recite even the substance of the testimony in any of them bearing upon the mental capacity of the persons involved, but a reading of the opinions will reveal that in many of them the testimony as to the mental impairment of the testator was equally as strong, if not stronger, than the testimony we have thus far related upon the mental condition of the insured in this case, and

it would seem that, if the rule as applied in will contest cases should prevail in this character of case, defendant's motion for a peremptory instruction should have been sustained.

But there is yet another piece of testimony introduced on the trial of this cause which to our minds conclusively demonstrates that the insured knew at the time he fired the fatal shot that it would result in his death, and which result he then and there contemplated and intended. That testimony is the "suicide note" that he wrote immediately before taking his life. It says:

> "Goodbye loved ones and dear sweet baby. I ask forgiveness from one and all. Trouble is the cause. Will."

It seems to us that it would be folly, as well as a travesty upon the administration of the law, for a court, whose solemn duty it is to ascertain the truth and administer justice, to conclude and adjudge otherwise than that the language of that note convincingly demonstrates that its writer fully realized and thoroughly knew what he then and there purposed and contemplated, and which purpose he almost immediately thereafter carried into execution. We are unable to see how any one of ordinary intelligence, in the light of human observation and experience, could come to any other conclusion than that the writer was bidding his loved ones good-bye because he contemplated departing from them. Such contemplated departure was of such a nature that he thought it necessary to ask their forgiveness and to reveal to them the reasons for his contemplated rash and abnormal act.

In only two of the many suicide cases brought to this court, so far as we have been able to find, did there appear a note written by the deceased, and they are Sovereign Camp Woodmen of the World v. Ethridge, 166 Ky. 795, 179 S. W. 1022, and Penn. Mutual Life Ins Co. v. Roberts, 207 Ky. 524, 269 S. W. 736. The note in the Ethridge case did not relate to the contemplated suicidal act. Insured had been arrested and charged with the crime of grand larceny, and the note, the date of which does not appear, was addressed to his mother, and in which he denied his guilt and asserted his innocence. Clearly it could and did not contain any inherent evidence of any contemplated suicidal act, and for that

reason could have no bearing upon the issue now being considered.

In the Roberts case the note read:

> "I have lost my mind. This is being written during a period of partial sanity. I want Mr. J. M. Parker in room 212 to take charge of my body, and arrange about getting it to Memphis, where my wife is, for burial. First communicate with her at 1961 Union Ave., Memphis, Tenn., and see if she wants me buried here or brought there for burial. I want him to see that my wife gets my insurance properly paid over to her, which at this time is over $40,000.00, also a $2,000.00 policy to my father & mother at Buchanan, Ky."

It was dated March 3, 1921, and the insured, who was the writer of it, committed suicide one month thereafter. In commenting on its probative effect, we said:

> "If written upon the night of insured's death it furnished much stronger evidence of suicide than if written a month before, and is by its terms almost, if not conclusive, proof that when written insured contemplated some action which he knew would result in his death."

Equally conclusive of that fact is the note written by the insured in this case, and which was done by him within a minute or two before he executed his contemplated act. When we add the force of that note to the other testimony we have herein reviewed, and duly weigh the whole of it in the light of human experience and human conduct, and then measure it by the rule governing the court's duty in giving peremptory instructions, we are forced to the conclusion that the evidence in this case failed to establish that the insured at the time he killed himself was *so insane* as that he did not know the consequences of his act or what he was doing, and which fact must be established, as we have seen, before the right of recovery exists. The rule governing the giving of a peremptory instruction is that, if upon a consideration of all the testimony, including collateral facts and circumstances, there is no reason for honest difference of opinion among intelligent men upon the issue, it is then the duty of the court to so instruct the jury. We think the testimony in this case leaves no room for the

conclusion essential to a recovery, and for that reason the motion for a peremptory instruction should have been given, and, if upon another trial the evidence is substantially the same as upon this one, the court will sustain the motion if made. The disposition of this error necessarily sustains error (3), and further comment thereon is unnecessary.

Wherefore the judgment is reversed, with directions to grant the new trial and for proceedings consistent with this opinion.