GEORGE F. GILMAN, *Appellant from decree of the Judge of Probate, versus* ANNA K. GILMAN.

If the domicil of a testator, at the time of his death, be in any other of the United States, his will, when its validity is not questioned, may be allowed and recorded in this State as a foreign will; and the moveable property in this State, belonging to the testator's estate, will be disposed of under the will, according to the laws of the State in which the domicil was established.

If the domicil be in this State, the Probate Court here will have original jurisdiction, and our laws must govern the construction of the will, and the disposal of the property.

In regard to questions of citizenship, and the disposition of property after death, every person must have a domicil.

It is an established principle of jurisprudence, *in regard to the succession of property*, that a domicil once acquired continues *until a new one is established*.

In regard to the succession of property, a person can have but one domicil.

If any general rule can be applied to a person having two dwellinghouses, — one in the city and the other in the country, — or in two different cities, and residing in each a part of each year, thereby leaving in doubt, so far as his domestic establishments alone are concerned, which of them is intended as the real domicil, it is, that *the domicil of origin*, or the *previous domicil*, shall prevail.

The *intention*, which combined with residence, establishes the domicil, must relate to the *future*, and not to the *past*.

An intention to dispose of his property according to the laws of any place does not tend to fix the testator's domicil there.

Nor, on the other hand, does the fact that he described himself, in his will, and in his codicil, as "of the city and State of New York," make any material difference.

On REPORT from *Nisi Prius*, RICE, J., presiding.

APPEAL from a decree of the Judge of Probate for the county of Kennebec, admitting to probate a paper claimed to be a copy of the last will and testament of Nathaniel Gilman.

On March 25, 1861, the appellee entered a petition in the Probate Court for the county of Kennebec, alleging, substantially, that she was heir at law of Nathaniel Gilman, late of Waterville, in said county, deceased; that he died at

Waterville, Dec. 19, 1859, leaving a large estate, real and personal, in said county; that said deceased was a citizen of, and had his domicil in said Waterville, at the time of his death; that the petitioner believed he left a will duly executed according to the laws of this State; that said will was in existence and unrevoked, at the time of the decease of the testator; that the petitioner was the daughter of the deceased, and is named in said will as one of the executors thereof; that said will was taken away and carried out of this State; that, after using reasonable diligence to obtain it, she has been unable to obtain said will to offer the same in probate; and that she has filed a true copy thereof, and was prepared to prove the execution thereof by a copy and the legal testimony of the subscribing witnesses thereto. The petition concluded with a prayer that said will may be proved and allowed, &c., the same as if the original will had been produced and proved.

After due notice ordered and published, the will was duly approved and allowed by the Judge of Probate, June 11, 1861.

From this decree, the appellants appealed within the time allowed by the statute.

On Jan. 3, 1860, George F. Gilman, named executor in said will, entered a petition in the Surrogate's Court, for the city of New York, praying that the instrument filed in said Court be proved.

At a term of said Court, holden Nov. 23, 1860, the appellee in the present case appeared and offered to show that the deceased was a non-resident, and a non-inhabitant of the State of New York, and was a resident and inhabitant of Waterville, in the State of Maine, at the time of his decease, and also that letters of administration had been granted on the estate before the proceedings were taken in the Surrogate's Court; *but the offer was overruled.*

On Feb. 24, 1863, a final judgment was rendered approving the will in New York.

The printed testimony in the case is contained in 243

Gilman *v.* Gilman.

octavo pages; but the material portions sufficiently appear in the succeeding pages.

*Bradbury*, *Morrill* and *Meserve*, for the appellants.

This case arises under provisions of c. 22 of laws of 1861.

1. The appellees allege and must prove that the domicil of Mr. Gilman, the testator, was in Waterville, at his decease.

2. Domicil in international law depends on residence and intention.

It has not the same restricted meaning as the words residence, dwellinghouse and home.

It is not necessary, to the establishment of one's domicil in a place, that he should have a particular house to which he could resort as matter of right, nor that he should live all the time in the town. 2 Kent's Com., 431 and note; *Wayne* v. *Greene*, 21 Maine, 357; *Drew* v. *Drew*, 37 Maine, 389; *Warren* v. *Thomaston*, 43 Maine, 406; *Jefferson* v. *Washington*, 19 Maine, 293; Story's Confl. of Laws, 39, 47; 20 Johnson, 208; 4 Wendell, 603.

3. If a person lives a portion of each year in two different places, his intention will determine which in law is his domicil.

He may elect. Story's Confl. of Laws, 3, 47; 2 Kent's Com., 3, 431 and note.

4. His declarations are evidence of his intention. If they are conflicting, his intention is to be ascertained from his character, condition and acts, as interpreters of his declarations. 1 American Leading Cases, 725.

II. Applying these principles to the evidence in the case, the appellants maintain that the testimony not only fails to establish Mr. Gilman's domicil in Waterville at the time of his decease, but clearly establishes it in New York.

1. His character was strongly marked. With great business capacity, he had an inordinate passion for money making. Outgrowing the field at Waterville, he removed to New York in 1836, to find a theatre suited to his powers.

He found it there and successfully filled it.

From the moment of his success he never contemplated abandoning it.

His letters and conduct up to the month of his death shew him as much devoted to business, as eager for money making, and as confident of his capacity, as in the prime of life.

2. The testimony shows that Mr. Gilman commenced business in New York in 1831; and that, after his marriage, in December, 1836, he removed there with his family, and continued in extensive business there, and to reside in that city and vicinity with his family, up to the time of his death, making Waterville a summer retreat during the warm and sickly season in the city.

3. It is the custom of many of the wealthy citizens of New York to resort to their summer residences during that season of the year.

4. Mr. Gilman usually left New York in mid-summer and returned in the autumn, spending about two-thirds of the year in New York and Brooklyn.

5. Several years he did not return to his house in Waterville, at all.

From 1841 to 1844 he kept house in Tenth street, New York.

From 1847 to 1853 he hired and furnished a house in Brooklyn, where he resided with his family. Subsequent to that time he boarded with his family, and made it his home, at the Astor House and other hotels in New York.

For more than twenty years all his business of consequence was in New York.

He had gathered all his children about him and established his sons and sons-in-law in business in that city.

6. Ten years before his death, he permanently closed his tomb in Waterville, and purchased a lot in Greenwood, on which he built a magnificent tomb "for the burial place for his family," and ornamented the grounds " so as to make it pleasant for his family to visit after he was laid there."

Gilman *v.* Gilman.

He then declared that he should never make his residence in Waterville again; that all his family were in New York, where it was much easier to get a living.

7. In the spring of 1859, after a search for many years, he purchased a dwellinghouse in Brooklyn, near his business in New York, "for a home for himself and family."

He fitted it up for occupancy, superintending personally.

He furnished it, to have it ready to move into upon his return in the autumn.

He purchased, prepared and ornamented a garden contiguous.

We call attention to a few of the many declarations of Mr. Gilman on the object of this purchase, as convincing evidence of his intention:—

He said to Mr. Walsh that he had purchased the house "expressly for himself and family to live in;"—he said "he wanted it repaired so he could move into it when he returned from the country."

*Mr. Miles* testifies that, after his purchase of a house in Brooklyn, Mr. Gilman said to him, that "he was fixing it up to reside in when he came back in the winter."

*Charles F. Gilman* says, I saw Mr. Gilman in July, before he went to Maine the last time. He was talking of having a bill of furniture from me. "He said he wanted to get every thing completed before he went away so as to move into his house in Brooklyn on his return; said he was fixing up his house to occupy on his return."

*Henry McClellan* says:—He succeeded in purchasing a house in Brooklyn. He laid out a good deal of money in fitting it up, and in laying out a garden on a vacant lot, &c. "He said he wished the house to be a home for his family after his death." He had his own furniture fixed up and removed there, waiting for his family to occupy it when he returned from the country. I saw him the day or the day before he started for Maine; he spoke of returning as soon as the hot weather was over."

*W. W. Gilman* says, "He said he bought the house to

live in himself," &c.   Calling attention to some furniture, he said, "There is the furniture you wanted me to make firewood of." He said it would answer just as well as to buy new.   He was painting the house and fixing it up, and spent most of his time there.

*George F. Gilman* says, "He said it was a very substantial, wellmade house, with plenty of land, a small garden and a fair neighborhood.  He said he wanted it for a permanent home for his family.   He said he did not think he would get into the house that spring season; but he meant to have it all ready when he came back in the fall to move right into."

*Edward McClellan* says, that Mr. Gilman conversed with him about the purchase before the title passed.   I visited the house and went over it repeatedly while repairs were going on.   "He said he had bought it for a home for himself and family after he was gone."   "For six years before, his furniture had been in Gold street; he had it fixed up and removed to his house in Brooklyn."

Prior to going into the country for the last time, he said to me, before leaving, that "he wanted to go at once into his house in Brooklyn when he returned, but he would have to go to the Astor House for a few days to make some final arrangements, and that he had left some packages there."

8. If it is said that Mr. Gilman's declarations and voting in Waterville, in 1856, tend to show his domicil there at that time; the evidence shows clearly that it was not there afterwards.

In the summer of 1857 he did not stop in Waterville declaring that, "if there was any question about his residence then, there should be none hereafter."

His declarations at the election in Waterville, had reference to voting, he supposing that any citizen of the United States could vote where he and his family had lived for three months.   Hence he urged his son to vote.

9. It is a significant fact that Mr. Gilman was not taxed

Gilman *v.* Gilman.

in Waterville, nor was his name kept on the list of voters there.

Upon his death, his family understood his body was to go to New York.

10. The value of declarations depends on the fidelity with which they are related and the circumstances under which they are made. Mere recital of residence in deeds and depositions, being immaterial to the questions depending on the instrument, are of comparatively little weight to those in instruments, like wills, where important rights depend upon the residence of the testator.

11. The appellees refer to Mr. Gilman's letters written just prior to his decease, and to his solemn declarations as to his residence contained in his will and codicil, as conclusive upon the question of intention.

In April, 1858, he commences the former: "I, Nathaniel Gilman, of the city and State of New York," &c.

And in the latter we have his dying declaration on the day of his decease, in the words: "I, Nathaniel Gilman, of the city and State of New York, now temporarily residing in Waterville," &c.

12. But there is further reason why the will of Mr. Gilman should not be allowed and established here. It is in evidence that the original will and codicil have been filed and proved in the appropriate court in New York, and that, under the authority of the court, the executors are administering upon the estate. 16 Con., 128.

It is a grave matter to attempt to oust a court of its jurisdiction in a sister State.

There can be no pretence that the codicil is legally proved, only two witnesses having been produced, and there being no legal excuse for the non-production of the third. 17 Mass., 68 ; 27 Maine, 17.

13. The disastrous consequences of a waste of the estate, that would probably result from a conflict of jurisdiction, invite a careful consideration of the case in all its bearings,

especially as the will makes the most wise and equitable provision for all parties.

*W. B. S. Moor* and *J. Baker*, for the appellee.

The opinion of the Court was drawn by

DAVIS, J.—This case comes before us upon an appeal from a decree of the Probate Court, admitting to probate and allowing the last will and testament of Nathaniel Gilman. It was proved by a copy, the original being beyond the jurisdiction of the Court.

The validity of the will is not questioned. But the testator left a large amount of property in the city of New York as well as in this State; and the will has been proved and allowed there, on proof of its execution merely, without any inquiry in regard to domicil. The Surrogate seems to have assumed that jurisdiction of the *property* conferred original jurisdiction of the *will*, whether the testator's domicil was there or elsewhere. Even if his decree were conclusive, which cannot be admitted, no decree was made by him upon that point, or that was intended to settle it, as a judgment binding upon the Courts of any other State.

If the domicil of the testator, at the time of his death, was in New York, then his will should be allowed and recorded in this State as a foreign will. R. S., c. 64, § 8. And, in that case, the moveable property in this State would be disposed of, under the will, according to the laws of the State of New York. Jarman on Wills, 2. But, if his domicil was in this State, then the Probate Court here has original jurisdiction, and our laws must govern the construction of the will, and the disposal of the property. *Harrison* v. *Nickerson,* 9 Peters, 483; Story's Conflict of Laws, § 481; *Bempde* v. *Johnstone,* 3 Ves. 199.

It would be well, if possible, to have a distinct and clear idea of what we mean by the term "domicil," before applying it to this case. It is no easy matter, however, to find a definition that has not been questioned. Vattel de-

Gilman *v.* Gilman.

fines it as "the habitation fixed in any place, *with an intention of always staying there.*" This is quoted with approbation by SAVAGE, C. J., in *Thompson's case,* 1 Wend., 43 ; and in the case of *Roberts' Will,* 8 Paige, 519. Chancellor WALWORTH adopts it in substance. "Domicil is the actual residence of an individual at a particular place, with the *animus manendi,* or a fixed and settled determination *to remain there the remainder of his life.*" This was slightly varied in Massachusetts, by WILDE, J., in *Jennison* v. *Hapgood,* 10 Pick., 77, where it is said to be a residence at a place "accompanied with the intention *to remain there permanently, or at least for an indefinite time.*" Vattel's definition was questioned by PARKER, J., in *Putnam* v. *Johnson,* 10 Mass., 488, in which "domicil" is said to be "the habitation fixed in any place, *without any present intention of removing therefrom.*" This form has been recognized in this State, as more nearly correct than any of the others. *Warren* v. *Thomaston,* 43 Maine, 406.

All definitions of this kind were criticised, with much force, by Lord CAMPBELL, C. J., in the case of *Regina* v. *Stapleton,* 18 Eng. Law and Eq., 301, in which he suggests that, if one should go to Australia, with the intention of remaining there ten years, and then returning, his domicil could hardly be said to continue in England. If he should leave his family in England, as stated in the supposed case, his domicil might properly be considered there. But, if a citizen of Maine, with his family, or having no family, should go to California, to engage in business there, with the intention of returning at some future time, definite or indefinite, and should establish himself there, in trade, or agriculture, it is difficult to see upon what principle his domicil could be said still to be here. His residence there, *with the intention of remaining there a term of years,* might so connect him with all the interests and institutions, social, and public, of the community around him, as to render it not only proper, but important, for him to assume the responsibilities of citizenship, with all its privileges, and its

burdens.   Such residences are not strictly within the terms of any definition that has been given; and yet it can hardly be doubted that they would be held to establish the domicil.

Other definitions have been given, which, though more general, are better adapted to. determine the case at bar. Thus STORY, in his Conflict of Laws, says that one's domicil is "his true, fixed, *permanent home, and principal establishment*, to which, whenever he is absent, he means to return." And, in *Munroe* v. *Munroe*, 7 Cl. & Fin., 877, Lord COTTENHAM says that, to effect the abandonment of one's domicil, and to substitute another in its place, "is required the choice of a place, actual residence in the place chosen, *and that it should be the principal and permanent residence.*"

That the testator's original residence was in Waterville, is admitted.   There he established himself in business, accumulated property, was married, and owned a house, in which, either continuously, or at intervals, he resided, with his family, until he died there in 1859.

It has been laid down as a maxim on this subject, that every person must have a domicil somewhere.   *Abington* v. *North Bridgewater*, 23 Pick., 170.   This may be doubtful, in its application to some questions.   A life may be so vagrant that a person will have no home in any city or town, where he can claim any of the rights or privileges appertaining to that relation.   But, in regard to questions of citizenship, and the disposition of property after death, every person must have a domicil.   1 Amer. Lead. Cas., 725, note.   For every one is presumed to be a subject of some government while living; and the law of some country must control the disposition of his property upon his decease.   It is therefore an established principle of jurisprudence, *in regard to the succession of property*, that a domicil once acquired continues *until a new one is established.* Therefore the testator's domicil must be considered in Waterville, for the purpose of settling his estate, unless he had

not only abandoned it, but had actually acquired a new domicil in New York.

It appears in evidence that he commenced business in New York about 1831, at first being there transiently; that in 1836 or 1837, having been married a second time, he was in the habit of spending considerable time there with his family, at the Astor House, and other hotels; that he hired a house there, in which he lived portions of the year from 1841 to 1844; that he bought a house in Brooklyn, which he occupied at intervals from 1847 to 1852; that he bought a lot in Greenwood Cemetery, on which he built an expensive tomb; that, after 1836, his principal business was in New York, and that several of his children were married and settled there in business. But he never disposed of his house in Waterville; he always kept it furnished, in repair, and supplied with fuel; he kept a horse and carriage there; he generally spoke of Waterville as his home; and, with the exception of one or two years, (and during those years he did not keep house anywhere else,) he lived in his house there, a portion of the year, with his family.

A person may have two places of residence, for purposes of business or pleasure. *Thorndike* v. *Boston*, 1 Met., 242; *Sears* v. *Boston*, 1 Met., 250. But, in regard to the succession of his property, as he must have a domicil somewhere, so he can have only one. *Green* v. *Green*, 11 Pick., 410. It is not very uncommon for wealthy merchants to have two dwellinghouses, one in the city and another in the country, or in two different cities, residing in each a part of the year. In such cases, looking at the domestic establishment merely, it might be difficult to determine whether the domicil was in one place, or the other. *Bernal* v. *Bernal*, 3 Mylne & Craig, 555, note. In the case of *Somerville* v. *Somerville*, 5 Ves., 750, 788, it is stated as a general rule, "that a merchant, whose business is in the metropolis, shall be considered as having his domicil there, and not at his country residence." But no such rule can be admitted. The cases differ, and are distinguished by other

facts so important, that the domicil cannot always be held to be in the city. It is frequently the case that the only real home is in the country ; so that, while some such merchants talk of going into the country to spend the summer, others, with equal propriety, speak of going into the city to spend the winter.

If any general rule can be applied to such cases, we think it is this ; *that the domicil of origin, or the previous domicil, shall prevail.* This is in accordance with the general doctrine, that the *forum origines* remains until a new one is acquired. 3 Kent, 431 ; *Kilburn* v. *Bennett*, 3 Met., 199 ; *Moore* v. *Wilkins*, 10 N. H., 455 ; *Hood's case*, 21 Penn., 106. And this would generally be in harmony with the other circumstances of each case. If the merchant was originally from the country, and he keeps up his household establishment there, his residence in the city will be likely to have the characteristics of a temporary abode. While, if his original domicil was in the city, and he purchases or builds a country house for a place of summer resort, he will not be likely to establish any permanent relations with the people or the institutions of the town in which it is located.

If we apply this rule to the case at bar, it will bring us to the conclusion that the testator's domicil in Waterville remained unchanged. Are there any facts that should make this case an exception to the rule ?

The testator continued to vote in Waterville about one half of the time. There is no evidence that he ever voted in New York. His manner of life there, boarding generally at hotels, where he always registered his name as from "Maine," renders it probable that he never claimed or was admitted to be a voter in that city.

He paid a tax upon personal as well as real estate in Waterville, a few of the years after he went into business in New York. He does not appear ever to have paid any tax in the latter place but one year. He evidently belonged to that class of men, fortunately small in number, who have

Gilman *v.* Gilman.

no stronger desire than to avoid the payment of taxes anywhere.

These facts have little tendency to establish anything but the *intention* of the testator. *Residence*, being a visible fact, is not usually in doubt. The *intention to remain* is not so easily proved. Both must concur in order to establish a domicil. *Harvard College* v. *Gore*, 5 Pick., 370. And, as both are known to be requisite in order to subject one to taxation, or to give him the right of suffrage, any resident who submits to the one, or claims the other, may be presumed to have such intention. Both parties claim that the will itself furnishes evidence of the testator's domicil. At most, it can be of little weight, except on the question of his *intention*. Such intention must relate to the *future*, and not to the *past*. A will made at or near the close of life will not be likely to throw much light on that question. It must be an *intention to reside*. An intention to dispose of his property according to the laws of any place, does not tend to fix the testator's domicil there. So that, if the will is made in conformity with our laws, and even if, as is contended, some of its provisions would be void by the laws of New York, that cannot affect the question of domicil. *Hoskins* v. *Matthews*, 35 Eng. Law and Eq., 532; *Anstruther* v. *Chalmer*, 2 Simons, 1. Nor, on the other hand, does the fact that he described himself, in the will, and in the codicil, as "of the city and State of New York," make any material difference. *Whicker* v. *Hume*, 5 Eng. Law and Eq., 52.

During the last twenty years of the testator's life, his ruling purpose seems to have been, to accumulate property abroad, and escape taxation there and at home. This led him to sacrifice, to a large extent, the enjoyments of domestic life, and to sever or neglect all those social ties which might have given him position and influence in the community. He pursued this process of isolation, because, while it did not interfere with his gains, it diminished his expenses. This was what rendered his domicil a question of doubt.

This is what gives to the testimony, as it gave to his life, an aspect of inconsistency and contradiction. But through it all there is apparent an intention to retain his home in Waterville, as a place of retreat for himself during life, and a place of residence for his family after his decease. He never had any such home elsewhere. And, upon the whole evidence, we are satisfied that his domicil was never changed. The decree of the Probate Court is affirmed, with costs for the appellees.

APPLETON, C. J., CUTTING, WALTON and BARROWS, JJ., concurred.