## Central Trust Company of Owensboro, Executor, et al. v. Bennett, et al.

(Decided March 27, 1925.)

### Appeal from Daviess Circuit Court.

1. Wills—Refusal to Submit Will Not Offered for Probate, and Prior to One Probated, to Jury Held Proper.—Where probate of will was contested on appeal to circuit court in trial de novo on grounds of testamentary incapacity, refusal to submit prior will which had not been offered for probate to jury held proper, under Ky. Stats., sections 4849, 4850, 4852, 4859; provision for referring any testamentary paper produced, to jury being applicable only to paper produced for probate below.
2. Wills—Wills Must be Proved Before, and Admitted to Record by, County Court of County of Testator's Residence.—Under Ky. Stats., section 4849, wills must be proved before, and admitted to record by, county court of county of testator's residence.
3. Courts—County Courts have Exclusive Jurisdiction of Probate of Wills.—County courts have exclusive jurisdiction of probate of wills.
4. Wills—Judgment Probating Will in County Court is Final and Conclusive.—Under Ky. Stats., section 4852, judgment probating will in county court is final and conclusive until vacated, reversed, or annulled in some of modes provided by statute.
5. Wills—Appeal from Probate in County Court is Only from Judgment Admitting or Rejecting Will to Record.—Under Ky. Stats., section 4850, appeal from probate in county court to circuit court

and thence to court of appeals is only from judgment admitting or rejecting will to record.

6. Wills—Circuit Court has no Power to Probate Will Other Than that Probated or Rejected by County Court.—Under Ky. Stats., section 4850, circuit court has no power to probate will other than probated or rejected by county court, and therefore may consider on appeal only the question as to whether will probated or rejected by county court is will of testator.

7. Wills—County Court May Probate Another Will, if Former is Set Aside.—Where probated will is set aside on appeal and such action properly certified to county court, it then has jurisdiction to probate another will.

8. Wills—Testamentary Incapacity Sufficiently Shown by Evidence. —Evidence of testator's acts held to show sufficiently abnormal conduct to justify finding of testamentary incapacity, and not mere eccentricity, which would render opinions of nonexpert witnesses based thereon insufficient.

SLACK, BIRKHEAD & SLACK and SANDIDGE & SANDIDGE for appellants.

CLEMENTS & CLEMENTS, BEN D. RINGO and L. I. IGLE-HEART for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Michael Cary, a resident of Owensboro, died on November 4, 1922. At the time of his death he was 81 years of age, and possessed a large estate, consisting of cash, securities and a great many small houses. He left a will dated May 5, 1920. When the will was made he had only one daughter, Bertha C. Bennett, one grandson, Cary Bennett, the son of his daughter, and two great-grandsons, Cary Bennett, Jr., and William Francis Bennett, who were the children of Cary Bennett, and who were only five and seven years old, respectively. After directing the payment of his debts and burial expenses, and providing for a fund to keep his cemetery lot in proper condition, he bequeathed to his two nieces $250.00 each, and to his nephew, William Cary, a 40-acre farm in New York, subject to certain conditions and limitations. He then bequeathed to his daughter, and to his grandson, Cary Bennett, the sum of $50.00 a month each, for and during their natural lives, with the further provision that the bequest to his daughter should go to his grandson on her death. At the death of his daughter and grandson he directed that the bequests to them be paid to the children of his grandson until the youngest should become of age, at which time he directed that the estate be

divided equally between them. In the event that his grandson died without issue, he provided that the monthly allowance directed to be paid to him should be paid to his nephew, William Cary. He also gave to Ada Cureton a life estate in the house and lot where he resided, and directed that all taxes, assessments, insurance and repairs thereon be paid out of the estate. After providing that the children of his grandson should be suitably educated and comfortably supported out of the income from his estate, he appointed the Central Trust Company of Owensboro trustee and executor, and gave certain directions as to the management of the estate.

The will was probated in the Daviess county court on November 8, 1922, and the Central Trust Company of Owensboro qualified as trustee and executor. The testator's grandson, Cary Bennett, prosecuted an appeal to the circuit court, where he contested the will on the ground of testamentary incapacity. The jury found against the will, and the propounders have appealed.

On the trial the appellants, after producing and reading the will in question, proved its execution by the attesting witnesses and closed their evidence in chief. Then followed the testimony for appellees. When appellees rested, appellants called certain witnesses in rebuttal. Then they called James A. Dean, Sr., who had prepared not only the will in question, but also a will dated June 18, 1912, and a codicil thereto dated June 18, 1918. Judge Dean testified that the testator had these instruments with him when he wrote the 1920 will, and produced carbon copies which were admitted in evidence. Thereupon, the propounders filed a written motion asking the court to probate the paper of June 18, 1912, and the paper of June 18, 1918, as the last will and testament of the testator in case it should be determined that the paper dated May 5, 1920, was not his will. The motion was overruled. At the conclusion of all the evidence the propounders again moved the court to peremptorily instruct the jury to find the paper of May 5, 1920, to be the last will of the testator. This motion was also overruled. The propounders then offered instructions A, B and C. Instruction A was a peremptory instruction to find the will of 1912 and the codicil of 1918 to be the last will and testament of the testator, provided the jury should find the paper dated May 5, 1920, not to be his will. Instructions B and C authorized the jury to find the original will and codicil to be the last will and testament of the testator in

case they believed from the evidence that they were executed in the presence of two witnesses, and that the testator was of sound mind at the time they were executed, and further believed that the papers produced were true copies of such will and codicil. The offered instructions were refused.

The refusal of the court to probate the original will and codicil in case the jury found the paper of May 5, 1920, not to be his will, or to submit the question to the jury, is the first error assigned. The applicable statutes are as follows:

"Section 4849. Jurisdiction of courts to probate wills.—Wills shall be proved before, and admitted to record by, the county court of the county of the testator's residence; if he had no known place of residence in this Commonwealth, and land is devised, then in the county where the land, or part thereof, lies; if no land is devised, then in the county where he died, or that wherein his estate, or part thereof, shall be, or where there may be any debt or demand owing to him.

"Section 4850. Appeals; trial of; time in which to be taken; effect of verdict; argument.—An appeal may be taken from the county court to the circuit court of the same county, and thence to the Court of Appeals, from every judgment admitting a will to record or rejecting it. The circuit court shall try both law and fact unless a jury be required. The Court of Appeals shall not hear any matter of fact pertaining thereto, other than such as may be certified from the circuit court; and the same effect shall be given to the verdict of a jury in a will case as is given to the verdict of a jury in other civil cases. The appeal to the circuit court shall be within five years after rendering the judgment of probate or rejection in the county court, and prosecuted to the Court of Appeals within one year after the final decision in the circuit court. The propounder of the will shall have the right to conclude the argument in the circuit court, and the Court of Appeals shall prescribe the course of argument in that court.

"Section 4852. Will not received as evidence until probated; effect of probate.—No will shall be received in evidence until it has been allowed and admitted to record by a county court; and its probate before such court shall be conclusive, except as to

the jurisdiction of the court, until the same is superseded, reversed or annulled.

"Section 4859.  Appeal to circuit court; parties summoned; trial; power of courts of equity.—When the proceeding is taken to the circuit court, all necessary parties shall be brought before the court by the appellant; and upon the demand of any of the parties a jury shall be impaneled to try whether or how much of any testamentary paper produced is, or is not, the last will of the testator.  If no jury be demanded, the court shall determine that question, and the final decision given shall be a bar to any other proceeding to call the probate or rejection of the will in question, subject to the right of appeal to the Court of Appeals as hereinbefore named; but nothing in this section shall preclude a court of equity from its jurisdiction to impeach such final decision, for such reason as would give it jurisdiction over any other judgment at law."

Relying upon the fact that a trial in the circuit court is *de novo*, and the language of section 4859, which provides that upon the demand of any of the parties, "a jury shall be impaneled to try whether or how much of *any testamentary* paper produced is, or is not, the last will of the testator," appellants insist that the circuit court has jurisdiction not only to try whether the paper probated or refused in the county court was the last will of the testator, but also to determine whether any other paper produced by the parties, whether ever offered in the county court or not, is the will of the testator, and to probate such paper as his last will.  Applying this rule to the case in hand they further insist that as the evidence showed that the original will of 1912 and the codicil of 1918, were produced by the testator to the draftsman at the time the will of 1920 was written, they must have been destroyed after that time, and that if the testator did not have sufficient mental capacity to enable him to make the will of 1920, he did not have sufficient mental capacity to destroy the original will and codicil, and, hence, they must be treated as never having been revoked.  Therefore, as there was no evidence of mental incapacity at the time the original will was written, the circuit court should either have instructed the jury to find that instrument to be the last will of the testator in case they found against the will of 1920, or should have

left it to the jury to determine whether the original will and codicil were his last will and testament.

It will be observed that section 4849 provides that wills shall be proved before and admitted to record by the county court of the county of the testator's residence, &c., and no rule is better settled than that county courts have exclusive jurisdiction of the probate of wills. Thompson v. Beadles, 14 Bush 47; Davies v. Leete, 111 Ky. 659, 64 S. W. 441. Not only so, but the order of probate is conclusive except as to the jurisdiction of the court until the same is superseded, reversed or annulled. Section 4852, *supra*. While an appeal may be prosecuted from the county court to the circuit court of the same county, and thence to the Court of Appeals, the statute makes it plain that the appeal is from a judgment admitting a will to record or rejecting it. Section 4850, *supra*. The statute does not go further and confer on the circuit court the power to probate a will other than that probated or rejected in the county court. Therefore, the only issue on the appeal is whether the particular instrument probated or rejected by the county court is the will of the testator (Kasey v. Fidelity Trust Company, 131 Ky. 604, 115 S. W. 737; Leake v. Leake, 73 S. W. 789, 24 R. 2217), and the jurisdiction of the circuit court is confined to the determination of that question. Of course, if two or more wills are offered for probate in the county court, and one is probated and the others are rejected, the parties in interest may appeal from the several orders, in which event, the circuit court will have jurisdiction to try which, if any, of the wills so offered is the will of the testator. This practice was followed and approved in Bradshaw v. Butler, 125 Ky. 162, 100 S. W. 837. It is true that we approved the action of the circuit court in permitting the propounders in that case to amend the statement which they had offered for probate in the county court as the lost will of the testator, but this was done on the ground that the statement related solely to the contents of the particular will, and not to a separate and distinct instrument. Having this view of the question we conclude that the words, "any testamentary paper produced," occurring in section 4859, *supra*, necessarily mean only such papers as are first offered and either probated or rejected, in the county court. Were the rule otherwise, great injustice would follow. On the appeal, the position of the contestants is that the will probated is not the will of the testator. To sustain this

position they come prepared to show that the testator was not of sound mind when the paper was executed, or that it was obtained by fraud or undue influence. In the very nature of things they can not be prepared to prove that some other will which had never been offered in the county court, and which they did not know was in existence, was not the will of the testator. Hence, if an entirely different paper may be produced and probated in the circuit court, the result will be to make an issue not contemplated by the parties, and to give the circuit court original jurisdiction of the probate of wills. Couchman v. Couchman, 104 Ky. 680, 47 S. W. 858, and Thruston v. Prather, 20 R. 877, 47 S. W. 871, do not announce a contrary doctrine, but merely give effect to the well-established rule that a judgment probating a will in the county court is final and conclusive until vacated, reversed or annulled in some of the modes provided by statute, by holding that after a will has been probated by the county court it is without jurisdiction at a subsequent term to probate an inconsistent paper as a codicil thereto. Of course, if a will probated by the county court is set aside on appeal, and that fact properly certified to the county court, the county court then has jurisdiction to probate another will. It follows that the court did not err in refusing to submit the original will and codicil to the jury.

Another contention is that the evidence of testamentary incapacity was not sufficient to take the case to the jury, or to sustain the verdict. The evidence for the contestants may be summarized as follows: According to Dr. J. N. Fireline, the testator could not carry on a conversation or keep a chain of thought very long. On one occasion he came to the office of witness in the Smith & Bates building, and asked if that was not the Odd Fellows' building, which, as a matter of fact, was located across the street. Mrs. Bailey and Mrs. Ware, tenants who occupied houses on the street in the rear of testator's residence, say that on two or three occasions he came to collect their rents after they had been paid. On one occasion he asked Mrs. Bailey if she was not Mrs. Ware, although they did not look alike. One witness testified that on two different occasions he helped the testator hunt for his horse and buggy while he was down town when, in fact, testator had walked to town leaving his horse and buggy at home. Another witness says that he met testator on Frederica street, and testator asked him

where the Owensboro Banking Company was. Witness said, "What is the matter with you, Mike?" and the latter replied, "I am off." Another witness says that on one occasion testator got into a buggy hitched to a mule and claimed it was his. When he showed the testator that there was a mule hitched to the buggy the latter gave a silly laugh and went over and found his own buggy and went up the street. According to another witness, the testator told a stranger that he did not know where the Roby Hotel was, although it was right by him. On one occasion he came to a tinner to get him to do a job of tin work, but he could not find the house, although he visited several places. They finally came to the end of a street where it was blocked off and the testator wanted to know why the people had blocked up the street. Witness told him that that was the end of it—that the river was on the other side. Charles A. Payne, who had known testator a great many years, testified that on one occasion he went to his home and found money and checks scattered all over the floor. The testator gave him a check for $5,000.00 payable to the Elks J. D. Shortell Charity Fund. He returned the check because he regarded the testator as irrational. One Sunday evening the testator, in the company of two girls, drove a buggy on to the Union station platform, one wheel being on the railroad track and the other being on the platform. R. P. Robertson, who attended to some business for the testator, gave it as his opinion that he was wholly incapacitated to make a will, as his mind was so weak it could not retain an impression for over a minute at a time. He also stated that the testator owned considerable property that he had lost sight of and forgotten about, and he had to locate the property for him. According to Tom Miles, the testator talked in an irrational manner. He met him one day at the hotel and testator joined his hands together and threw his thumbs over each other and said, "This is the way I live and this is the way I die; this is the way I live and this is the way I die." He then threw his fingers up and said, "This is the way I die, he-he." In his opinion the testator on that occasion talked irrationally. After collecting rent from T. J. Hutchinson, he went across the street and returned and wanted to collect the rent again. G. W. Higginbotham, a carpenter who was repairing his houses, asked testator to go down town and get some paint, and he got some lumber instead. W. E. Aud served with the testator on the

board of directors of the Owensboro Planing Mill Company, and in his opinion the testator was not competent to attend to business.  Formerly, he made many motions, but in the last year or two he never made any motions, but would sometimes second a motion, and when you asked him what it was he didn't know.  Dr. J. H. Taylor, a dentist, lived next door to the testator for about a year and would sometimes talk to him over the fence.  The testator would meet him down town and ask his name, never at any time remembered his name.  On one occasion he bought two bushels of potatoes from the testator for $1.50, handed him $2.00 and the testator gave him back the change.  Immediately thereafter testator opened his pocket-book and wanted to pay him the change again.  Mrs. Ada Cureton and her husband, with whom the testator lived for a great many years, and their daughter, Annabell Norton, and Millett Norton, testified to the following facts: The testator used a wash bowl in his room as a slop jar.  On one occasion he ate two bowls of gravy with a spoon without bread.  He ate soft-boiled eggs, including the shells.  The eggs would be opened up and the shells placed on the side of his plate, and after eating his eggs, he would deliberately turn around and eat the shells.  At such times he would not know what he was doing.  He didn't know his kinsfolk, or those who lived in the same house with him.  He often lost track of his houses and would rent the same house to different parties.  This was true both while the testator was drinking and while sober.  On one occasion he offered Mr. Cureton $1,000.00 if he would kill him.  The testator wrote and placed on his desk a statement wherein he said that he was incompetent to transact business and warning himself not to make any trades without consulting Mrs. Cureton.  According to W. H. Foster, he went out driving with the testator three or four times, and every time the testator would get lost and would not seem to know where he was going.  In 1919, the year before the will was written, the testator got lost in a section that he had known all his life.  On several occasions John Lyons, the chief of police, was called on to serve notices on tenants who were not behind with their rent.  Cary Bennett testified that upon the return of the testator from a trip to Indiana the testator failed to recognize him at the station.  He also met the testator in 1920 and the testator did not know him.  On another occasion the testator wanted to know where the Central Trust

Company was located. Several times he accompanied the testator home and the testator asked him who he was. There was other evidence that he didn't recognize his own property or other well known buildings, and several witnesses say that when he attended the funeral of his own daughter he never did understand and appreciate whose funeral it was.

On the other hand, a number of prominent citizens who had had business relations with the testator, all testified that in their opinion the testator was perfectly competent to attend to business, and that they never noticed anything wrong with his mind or actions. Particularly impressive is the testimony of J. A. Dean, Sr., and J. A. Dean, Jr., who drew the original will and codicil, as well as the will in question. According to them, the testator appeared with the original will and codicil with some notations in writing thereon, suggesting a few changes made necessary by a change in circumstances. With two or three exceptions, the last will was practically the same as the original will and codicil. It was further shown that he purchased and sold a number of pieces of real estate, and that in carrying on these negotiations he knew how to protect his own interests. In addition to this, he made large deposits in bank, about 80% of the deposit slips were in his handwriting and all of them are free from error.

Appellants insist that the case falls within the rule that where the facts relied on are insufficient to show mental incapacity, the opinions of nonexpert witnesses based thereon are likewise insufficient for that purpose. While the rule has been applied in numerous cases, Schrodt's Exor v. Schrodt, 181 Ky. 174, 203 S. W. 1051; Bailey v. Bailey, 184 Ky. 455, 212 S. W. 595, it has its limitations, which in Wood v. Corcoran, Admr., 190 Ky. 621, 228 S. W. 32, we were careful to set out in the following language:

> "A reading of the cases above cited, and those referred to therein, will show that this court has consistently held that occasional and isolated facts concerning the actions and conduct of the testator which prove no more than to show him an eccentric individual, or as one curious and queer in his disposition and conduct, or whose actions, which may be somewhat out of line with the course of conduct usually pursued by the generality of mankind, will not, of themselves, be sufficient to establish mental

incapacity; but it has never 'been held that where the proven acts are so far afield, and constitute such a wide departure from the usual course of conduct of normal individuals as to indicate a derangement of mind, the case should be taken from the jury, although the witnesses testifying to the facts were nonexperts and their opinions based upon such facts were the only opinions proven in the case. In some of the cases referred to, opinions were ventured by the witnesses, but neither they nor any other witnesses testified to any irrational act or conduct on the part of the testator; while in others of them it was held that the supposed irrational acts or conduct, testified to, were not such, because they did not show a sufficient departure from rational conduct to authorize a finding of mental incapacity."

Looking at the evidence for the contestants in the light of these principles, it seems to us that it presents a series of acts so inconsistent with the conduct of a normal man as to indicate derangement of mind, and we can not say that its probative effect was so completely overcome by the evidence of the propounders as to justify the conclusion that the verdict is flagrantly against the evidence.

Judgment affirmed. Whole court sitting.