# Johnson et al. v. Harvey et al.

(Decided Nov. 29, 1935.)

WOODWARD, HAMILTON & HOBSON, THOMAS S. DAWSON, W. R. GARDNER and RODES K. MYERS for appellant.

C. EWBANK TUCKER and EVERETT RAY for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

This appeal is prosecuted by Wm. M. Johnson, Jesse Johnson, Dora Helm, and Hester Mason from a judgment sustaining the probate of a certain paper as the will of their brother, Robert H. Johnson.

## Steps Taken.

The contest of this will is based upon lack of mental capacity, upon forgery, and upon fraud practiced on and undue influence and coercion exercised over the alleged testator by Edward Harvey; and the jurisdiction of the Jefferson county court is sharply attacked as will appear from this which is copied from the pleadings:

> "Plaintiffs further allege that at the time of said decedent's death, he was a citizen and resident of Bowling Green, Warren County, Kentucky, and that the Jefferson County Court was on account thereof without jurisdiction to probate his alleged will, and that its act in so doing was void and that all orders probating said will, appointing an executor, fixing his bond, and qualifying him as such, are void as a result of lack of jurisdiction."

If in fact Robert H. Johnson was domiciled in Warren county at the date of his death, then the order of the Jefferson county court, made January 13, 1934, was void. Plaintiffs, before appealing to the Jefferson circuit court, made a motion in the county court to set

aside the order of probate as void, and proof was heard in the Jefferson county court upon that question, but that motion was overruled. Thereupon, the plaintiffs appealed to the Jefferson circuit court, and, from a judgment entered on a directed verdict there, this appeal is prosecuted.

### Where was the Domicile of Robert H. Johnson?

As the correctness of this judgment, exercising jurisdiction, turns upon the place of Robert H. Johnson's domicile at the time of his death (for the probate of a will by any county court other than that of testator's residence is utterly void, Hite's Adm'r v. Gibson, 251 Ky. 651, 65 S. W. [2d] 731), we shall give a bit of the life history of Robert H. Johnson.

He was born in Warren county, Ky., about the year 1868. He spent his early youth in that county. He was never married. He led a nomadic life. He became a serving man, and was employed as a hotel waiter in New York, New Orleans, San Francisco, and in divers cities of this country. He had also learned the barber trade, and for 16 or 18 years he ran a barber shop in Louisville, Ky., until March 5, 1932, when, his health having failed, he sold out to his partner, Peter Lewis.

Lewis testified, and this is taken from his testimony:

"Q. What did he say, if anything, about where he was going to make his future home when he left Louisville on that occasion? A. He said he was going down to his people, down in Butler County."

Testator came to the home of his brother, Wm. M. Johnson, in Morgantown, Ky., and stayed there with him for a few weeks, then he went to the home of his sister, Hester Mason, in Woodbury, Butler county, Ky., and stayed a few weeks with her, then went to the home of his sister, Dora Helm, in Bowling Green, Ky., and she testifies that there he made his home; that he had sold out and come to live with her. A boyhood companion of the testator was in business in Bowling Green, and he testified he had several conversations with testator, and this is from his testimony:

"I saw him from time to time. He lived about four or five blocks from me, at least, that is where his sister lived, and he was in and out. * * * He told

me he was coming home to stay. He had been away and sold out and lost his health and he was coming back home to stay. That was some time in '33, I think about June or July; that he was winding up, and that he had made his will and left his estate to his brothers and sisters.''

On January 24, 1933, Johnson had a will written; not the one in contest here, but a different one which was probated by the Warren county court, which will begins thus:

''I, R. H. Johnson, of Bowling Green, Warren County, Kentucky, being of sound Mind and Memory, knowing the Certainty of death and the uncertainty of life desire to and do make this My last will and testament.''

This is taken from the deposition of Judge John R. Phelps, the scrivener of the Warren county will:

''He stated that he owned a house and lot in Bristow, Warren County, Kentucky; and 68 shares of stock in the Mutual Standard Bank of Louisville, Kentucky; in the hands of receiver of the National Bank of Kentucky, $588.00; on deposit in the First National Bank, Louisville, Kentucky, $1,219.95; Cash on his person, $185.00; $105.00 stock in the Anchor Life Insurance Company, Cleveland, Ohio; this at that time made up his entire estate, both real and personal.

''Q. Did he say anything to you about where his home was, and where he expected to live the remainder of his life? If so, where? A. At Bowling Green, Kentucky.

''Q. At whose house, if he said? A. His sister's, Dora Helm's.

''Q. Who were his next of kin? A. Dora Helm, W. M. Johnson, Jesse Johnson, and Hester Mason, who were his brothers and sisters.

''Q. Did he have any brother or sister dead at the time of the writing of this will who left children surviving them? A. No, sir.

''Q. Were his father and mother, both, dead, at the time of the writing of this will? A. Yes, sir.

"Q. You say that he told you what he wanted done with his property; what did he tell you in regard to what he wanted done with his property at the time of his death? A. He wanted it to, after his burial expenses were paid, be divided equally, share and share alike between his brothers and sisters.

"Q. Did he say anything about what he wanted done with his body, after his death? A. Yes, sir. He wanted it buried by the side of his father in Butler county, Kentucky.

"Q. Did you see him any time immediately before you wrote the will? A. I saw him some few months before the will was written but I never saw him after the will was written.

"Q. Do you know whether or not he had quit barbering? A. Yes sir.

"Q. Just what did he tell you about it? A. He said he had sold out.

"Q. Did he, at that time, after telling you what he had done with his business, tell you where he expected to make his future home for the rest of his life? A. Yes sir. At Bowling Green.

"Q. Did he name any person that he wanted to carry out the provisions of his will, to be appointed? A. He named Robert Johnson, a nephew.

"Q. Where does he live? A. Bowling Green, Kentucky.

"Q. Did he tell you why he was going to Louisville when you wrote the will? A. Yes. To have his physical condition checked over by doctors in Louisville, and perhaps some treatment.

"Q. Do you know why he had the will written at the time he did have it done? A. Yes, he stated, in his physical condition, he did not know what might be the outcome, and wanted arrangements made about his estate in case anything should happen to him before he could get back home."

On January 26th, after this will was written, testator came to Louisville and remained until February

18, 1933, when he returned to the home of Dora Helm in Bowling Green and remained there and paid her board for four or five months. Then he returned to Louisville, and there he died on December 27, 1933.

During his stay at Dora Helm's in the summer of 1933, the testator's health improved somewhat, and Jesse Johnson testifies he had a conversation with him the Sunday before he left for Louisville the last time, and this is taken from his testimony:

"He said he thought he would come back to Louisville, and he was feeling pretty good and it might be that he could come back and transact a little business."

Robert Johnson, Jr., testifies to a conversation he had with testator at Dora Helm's in July, 1933, and he testifies:

"He said he was coming back to Louisville, he was better. He was coming back to Louisville and stay a while."

Wm. M. Johnson visited testator in Louisville on September 29, 1933, and he testifies:

"He was getting along fairly well he was getting able to go to work, and he said, 'If I am not able to go back to work, I will be down to Dora's and stay there all winter.'"

Wm. M. Johnson testifies he invited testator to attend a surprise gathering the family intended to have at Dora Helm's on Christmas Day, and he introduces this letter he received from him:

"Louisville, Dec. 6th, 1933.

"Dear Brother:—Yours came to hand and found me very poorly. I like the idea of meeting at Dora's Christmas Day. I don't know if I can or not. That business was no good. I got out of it. Tell Jesse to meet you at Dora's. I will come if I can.

"R. H. Johnson."

He did not come, and on December 25, 1933, he was admitted to the City Hospital, where he died on December 27th.

The will in contest purports to have been written

December 18, 1933. It leaves practically all of Johnson's property to appellee. It begins thus:

"I, Robert H. Johnson, a resident of Louisville, in the County of Jefferson, and State of Kentucky."

The appellee testifies, and this is taken from his testimony:

"Q. During the last six months of his life or approximately so, where did he live? A. He lived with me.

"Q. Johnson, I understand, lived in the back of your store. A. Yes sir.

"Q. How large was the room he lived in? A. I don't know, something about 10x12 or possibly larger.

"Q. Did he pay rent on that place? A. He did.

"Q. He sometimes ate at the store and sometimes ate at the restaurant? A. Yes sir.

"Q. Have you ever been convicted of a felony? A. I have."

The domicile of Robert H. Johnson when he died was sharply in issue; yet what we have set out above is all the evidence upon it that we have been able to glean from this record. He owned a house and lot in Warren county upon which we presume he paid taxes, but there is no direct evidence he ever paid taxes on anything anywhere, or that he ever voted or registered as a voter anywhere. Since the appellee was in possession of the decedent's books and papers, the presumption, as to these matters, is against him.

By this appeal the Jefferson circuit court succeeded to the jurisdiction of the Jefferson county court without diminution or enlargement; it has simply that and nothing more as well as nothing less. Except for this appeal and the resulting succession to the jurisdiction of the Jefferson county court, the Jefferson circuit court would have no semblance of jurisdiction in this matter. "Jurisdiction in courts is the power and authority to declare the law. The very word, in its origin, imports as much; it is derived from juris and dico—I speak by the law." Works' Courts and their Jurisdiction, p. 20.

Thus the very first question for this court to determine, as well as the first question for the Jefferson circuit court to have determined, is the jurisdiction of the Jefferson county court; for if the Jefferson county court be not authorized by law to speak, then neither was the Jefferson circuit court. By section 4849, Ky. Stats., it is provided that wills shall be probated by the county court of the county of the testator's residence, so that the testator's residence becomes the sole subject of inquiry, for unless Robert H. Johnson died a resident of Jefferson county, then everything done in that county by any of its courts relative to the probate of this will falls, for none of those courts were authorized by law to speak. This sends us hunting through this record to learn what was the county of Robert H. Johnson's domicile when he died.

The word residence is frequently used in our statutes and Code in the sense of domicile. It is so used in the statute last cited, and in many of our opinions. It was so used in Virginia. See chapter 8, Act Oct. 1777; chapter 4, Act May 1785; section 1, Act May 6, 1782, in Act Dec. 20, 1785, etc.

There is, however, a well-marked distinction between one's residence and his domicile. Sitting as it does for the correction of errors, this court finds its greatest delight in correcting its own, and we take this opportunity to say we were not entriely correct in saying in Com. v. Ott, 223 Ky. 612, 4 S. W. (2d) 417, 419, "One may have a home in two different places, though he cannot have two different residences." It would have been more correct if we had used the word domiciles in the place of the word residences; but practically the same is said in Boyd's Ex'r v. Com., 149 Ky. 764, 149 S. W. 1022, 42 L. R. A. (N. S.) 580, Ann. Cas. 1914B, 481.

After the Norman invasion of England, this situation existed. The Conqueror, being French, spoke of a man's temporary living place as his residence, and his permanent establishment as his domicile, while to the Saxon, the former was his abode and the latter was his home. When the Conqueror summoned the Saxon for service in the army, for payment of taxes, etc., he made demand of him at what the Conqueror called the Saxon's domicile or residence. Thus we now have all four words in use, but the word domicile has come to

mean that place to which a man's rights and obligations of citizenship are referred and by which his legal status, public and private, is determined; while home still means to us as it did to our Saxon forbears, the place to which, when weary, we can go and sit, with shoes unlaced, and rest.

In City of Lebanon v. Biggers, 117 Ky. 430, 78 S. W. 213, 214, 25 Ky. Law Rep. 1528, we said:

"It is a maxim of the law that every person must have a domicile, and also that he can have but one, and that, when once established, it continues until he renounces it and takes up another in its stead."

To same effect, see Domicile, 19 C. J., particularly section 4, p. 398. This question is elaborately discussed in Robinson v. Paxton, 210 Ky. 575, 276 S. W. 500. Also, see, Louisville & N. R. Co. v. Kimbrough, 115 Ky. 512, 74 S. W. 229, 24 Ky. Law Rep. 2409; Sumrall's Committee v. Com., 162 Ky. 658, 172 S. W. 1057; Miller v. Swan & Brown, 91 Ky. 36, 14 S. W. 964, 12 Ky. Law Rep. 629; Fidelity Trust & Safety Vault Co. v. Preston, 96 Ky. 277, 28 S. W. 658, 16 Ky. Law Rep. 461; Ewing v. Ewing, 255 Ky. 27, 72 S. W. (2d) 712; Baker v. Baker, Eccles & Co., 162 Ky. 683, 173 S. W. 109, L. R. A, 1917C, 171; Semple v. Com., 181 Ky. 675, 205 S. W. 789; City of Winchester v. Van Meter, 158 Ky. 31, 164 S. W. 323; and Montgomery v. Lebanon, 111 Ky. 646, 64 S. W. 509, 23 Ky. Law Rep. 891, 54 L. R. A. 914. A student will find the opinion of the House of Lords, Winans v. Atty. Gen., 1904 A. C. 287, both interesting and instructive.

Domicile may be divided into domicile of origin (that is, where one is born or reared; for Johnson this Warren county), domicile of choice (here we have no satisfactory evidence Johnson ever acquired such, unless it can be presumed he acquired such in Louisville, from his 16 or 18 years of engagement in business there, which we need not decide), and domicile by operation of law, as in the case of a woman, who by operation of law acquires the domicile of her husband. See 19 C. J., Domicile, secs. 5, 6, 7, and 8. Whether Robert H. Johnson ever acquired a domicile in Louisville is very doubtful, for it requires more evidence to show the loss of the domicile of origin than any other, and it is of all domiciles the one most easily regained; there is more

to "Home Sweet Home" than its musical harmony and literary charm; there is in it an appeal to human nature that is quite resistless; and, since human nature is the one element that is found in all the records that come to the courts, it is but natural that we should find what we have noted above relative to the domicile of origin. If it had been shown that during his 16 or 18 years of business sojourn in Louisville, Robert H. Johnson had registered as a voter, had voted, and done every other thing to indicate he was domiciled there, he certainly lost that domicile in 1932, when he sold out and went to Warren county to the only place this evidence shows he ever owned a dwelling, and repeatedly declared his intention to there remain indefinitely. This leaves for our consideration the effect of his return to Louisville and his five months' sojourn there just previous to his death. Was there any evidence in that of his resumption of his domicile in Louisville, if he ever had such?

The presumption favoring, the reacquisition of a former domicile is similar to that favoring the resumption of the domicile of origin, but not so strong. Johnson spent his last five months in Louisville; that is established; but we have no evidence of his intention to remain there indefinitely. Quite to the contrary we find him saying to his brother that if he did not get able to go to work he would be back at Dora's. The only scrap of evidence we have is that in the paper dated December 18th he is described as a resident of Louisville. This paper we must remember is attacked as a forgery, as executed because of fraud, undue influence, coercion, and because executed at a time when he had not the mental capacity to know what he was doing, and that because of section 4852, Ky. Stats., it cannot be received in evidence until it is probated, and that its probate was reopened before the Jefferson circuit court for trial de novo, still we have held that such a paper may be received as some evidence under some circumstances. See Thomas v. Arthur, 7 Bush (70 Ky.) 245; Montgomery's Adm'r v. Miller, 4 B. Mon. (43 Ky.) 470, 471; Central Trust Co. v. Bennett, 208 Ky. 281, 270 S. W. 821; and Trivette v. Johnson, 257 Ky. 681, 79 S. W. (2d) 6. It will be observed the wills offered in evidence in those cases were not then themselves in contest as is the one before us, nor was objection made to the introduction of this will.

Without now expressing any opinion as to the reception of this statement in this case, let us see what effect it has, what weight it has. In Story on Conflict of Laws, Judge Story, in discussing "What Constitutes Domicile," in chapter III, section 44, note (d) on page 45, at page 46, says, "His descriptions of himself in legal instruments are treated as declarations, but in some cases it has been said that by themselves they are entitled to but little weight," and he cites numerous authorities in support of his statement. "The statements of residence in a holographic will are entitled to great weight, but in one prepared by an attorney, where he inserts the place of residence as in part a matter of form, such statement is not controlling." In re Golden's Will, 40 Misc. 544, 82 N. Y. S. 990, 991.

In Smith v. Smith's Ex'r, 122 Va. 341, 94 S. E. 777, the will began, "I, William C. Smith, of the city of Baltimore, Maryland, do make this," etc., yet the Supreme Court of Appeals of Virginia held Smith to be domiciled in Virginia, and, in doing so, said:

"It is therefore manifest that the domicile of William C. Smith being an issue in this suit, his domicile must be determined from all of the evidence in the suit in like manner as any other fact."

In Mackenzie v. Mackenzie, 3 Misc. 200, 23 N. Y. S. 270, testator declared in his will he was of Jersey City, N. J. He had a house there, and had his library there, and spent the winters there; yet he also had a house in Glen Spey, N. Y., which he occupied a part of the time. He voted in Glen Spey, served as postmaster there and as school trustee. It was held he was domiciled in Glen Spey, N. Y.

We copy now from the opinion in Gilman v. Gilman, 52 Me. 165, 83 Am. Dec. 502. Gilman's original home was Waterville, Me. He never parted with that house, and spent a portion of his time there, and died there in 1859. In 1831, he engaged in business in New York. First he stopped at a hotel; later he lived in a rented house there; still later he bought a house there and lived in it; and bought a lot and built an expensive tomb in Greenwood Cemetery. After 1836, his principal place of business was there. There is no evidence he ever voted there. He continued to vote in Waterville about half the time. Nor, on the other hand, does the fact that he described himself in the will and in the

codicil as "of the city and state of New York," make any material difference. At most, it can be of little weight, except on the question of his intention. Such intention must relate to the future, and not to the past. A will made at or near the close of life will not be likely to throw much light on that question. It must be an intention to reside. An intention to dispose of his property does not tend to fix the testator's domicile. The court held Gilman's domicile was in Waterville, Me.

In Ennis v. Smith, 14 How. 400, 422, 14 L. Ed. 472, the United States Supreme Court said this concerning such a statement in the four holographic wills of General Kosciusko:

"His declarations that his residence was in France, in the way they were made in his wills, with an interval of ten years between them, would, upon the authority of adjudged cases, be sufficient to establish, prima facie, his domicile in France. Such declarations have always been received in evidence, when made previous to the event which gave rise to the suit."

The event that gave rise to the litigation in Ennis v. Smith, 14 How. 400, 14 L. Ed. 472, was this: Benjamin F. Lear was appointed administrator of Gen. Kosciusko. He died, and Col. Bomford became his executor, and this was an action for accounting and distribution against sureties of Lear, and Bomford and his sureties, an event occurring after the wills were made and those wills were holographic, yet the court held those statements made only a prima facie case, whereas in the case before us the declaration concerning domicile is made in the paper itself; the alleged execution of which is the event that gave rise to this controversy.

We are persuaded this statement in the paper in contest, that Johnson was "a resident of Louisville, in the County of Jefferson, and State of Kentucky," was written in by the scrivener as a matter of form and routine, without its being called sharply to Johnson's attention, if indeed it was called to his attention at all. The scrivener of this paper testifies, but nowhere in his testimony does he say he asked Johnson about his domicile, which is in striking contrast to the testimony of Judge Phelps, from which we have quoted rather liberally for the purpose of showing how meticulously

he went about the preparation of the paper probated by the Warren county court.

A subscribing witness to the paper in contest was asked if Johnson could talk, and he answered, "Not much, because he was short of breath."

It is shown that Johnson could write, and writing of his is in this record; yet the paper in contest is signed by his mark, and the explanation is made that, "He attempted to sign it, then he fell back in bed and asked me to make his mark."

Everything showed Johnson was then practically moribund, and nine days later he was dead. He was not then expecting to live in Louisville, indefinitely. He was expecting presently to die, and die he did. Certainly there was not in this anything to conclusively establish that Johnson's domicile was in Louisville in the face of the evidence of his acts and declarations to the contrary found in this record.

### What Should the Court Have Done?

Here is what has been said about such a situation:

"It must always be ex officio the duty of every court to disclaim a jurisdiction which it is not entitled to exercise. To do otherwise would be to usurp a power not confided by the law." Hanger v. Com., 107 Va. 872, 60 S. E. 67, 14 L. R. A. (N. S.) 683.

"This court will, where no motion is made by either party, on its own motion, reverse a judgment for want of jurisdiction, not only in any case where it is shown negatively that jurisdiction does not exist, but even when it does not appear affirmatively that it does exist." Freer v. Davis, 52 W. Va. 1, 43 S. E. 164, 168, 59 L. R. A. 556, 94 Am. St. Rep. 895.

"Frequently in probate contests an issue arises as to the domicile of the testator. There is no absolute right to a jury trial of such an issue but it rests within the discretionary power of the judge. Ordinarily, the better procedure requires that such issue be disposed of by the court separate and apart from the determination by the jury of issues affecting the validity of the will." 68 C. J. p. 1043, sec. 840.

"Whenever the attention of the court is called to the absence of a jurisdictional fact, it may, and should, refuse to exceed its powers." 15 C. J. p. 732, sec. 27.

"Every judicial tribunal, invested with authority to be exercised in a certain contingency, has authority to inquire and ascertain whether the contingency has occurred. Where jurisdiction depends upon the existence of a preliminary fact, there is authority to decide whether that fact exists." Broom v. Douglass, 175 Ala. 268, 57 So. 860, 865, 44 L. R. A. (N. S.) 164, Ann. Cas. 1914C, 1155.

In this case the preliminary fact was the domicile of Johnson in Jefferson county. The trial court, as well as the Jefferson county court, in effect, found that domicile to be in Jefferson county, which was against the weight of the evidence, and therefore erroneous.

Plaintiffs' motion for a directed verdict searched the record. See Utterback's Adm'r v. Quick, 230 Ky. 333, 19 S. W. (2d) 980. That search discloses that the jurisdiction of both these courts was limited to the probate of wills of testators who died domiciled in Jefferson county, and the proof shows Johnson's domicile was in Warren county, hence neither of these courts had jurisdiction of the particular subject-matter because of its extraterritoriality; therefore, the judgment is reversed, the trial court will set it aside, and in lieu thereof will enter a judgment directing the Jefferson county court to set aside its probate of this paper, and dismiss the proceeding.